ColliNS, Judge,
dissenting:
I respectfully dissent from the decision of the majority. I cannot agree that the subcontracting business of KES was “completely liquidated” within the meaning of section 331 of the Internal Kevenue Code. Therefore, though I might otherwise accept the court’s treatment of the reorganization issue, I do not think it necessary to reach that question. Plaintiff’s retreat positions — (1) that the distributions in question were in partial liquidation of the corporation under sections 346 and 331(a) (2); and (2) that the distributions were not “substantially equivalent” to dividends — 'are, in my opinion, also without merit. Since the distributions of the earnings and profits of KES consequently do not fit within any of the exceptions to section 301, it is my opinion that the distributions to plaintiff should be taxed as dividends at ordinary income rates, as provided in that section.
I
As found by the commissioner, KES was primarily engaged in the business of carpentry subcontracting from December 1957 until at least July 1960. Subsequent to the formation of KEB in July 1960, however, KES phased out its carpentry subcontracting business in favor primarily of large public contracts. KEB, on the other hand, perpetuated the type of subcontracting business previously engaged in by KES. Whether in accordance with a plan or not, some of the assets of KES necessary to the operation of the subcontracting business were transferred to KEB (see finding No. 28); the initiative and experience of Mr. Simon followed the subcontracting business into the hands of KEB; and the labor force, goodwill, and prior business contacts of KES were all inherited by KEB. KES 'and its second business, large-scale contracting, were terminated on August 14, 1961.
*311 It is essential to note that the accumulated earnings and profits of KES were almost exclusively the result of the carpentry subcontracting business. Indeed, the efforts of KES subsequent to July 1960 to engage in the business of performing large-scale contracts were so unsuccessful that large losses were the result. Consequently, when KES was finally dissolved, the distributions to the shareholders were all, or nearly all, accumulated earnings and profits from the carpentry subcontracting business.
The first issue to be determined, then, is whether KES can be said to have “completely liquidated” its carpentry subcontracting business (so that the distributed earnings and profits attributable to that business would receive capital gains treatment under section 331) when KEB perpetuated that business and when both corporations were under the same effective ownership and control.
Section 331 (a) (1) provides that
* * * Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock.
Section 331 (b) provides that section 301 (which states the general rule that corporate distributions are dividends in the hands of the shareholders) shall not generally apply to distributions in complete liquidation of a corporation. But, unfortunately, Congress did not choose to define the term “complete liquidation” anywhere in the Code. The legislative history of section 331, however, as well as pertinent regulations, indicates clearly, in my opinion, the interpretation we should place upon that term when, as here, it has been found that the allegedly liquidated business of a corporation is being carried on in substantially the same form by another corporation under the same basic control as the first (see findings Nos. 10, 26(c), 69(f)).
Congress enacted tax legislation uniquely applicable to distributions in corporate liquidation for the first time in 1924.[1] The Senate Eeport accompanying the bill stated that
* * * A liquidating dividend is, in effect, a sale by the stockholder of his stock to the corporation; he sur *312 renders bis interest in tbe corporation and receives money in place thereof. Treating such a transaction as a sale and within the capital gain provisions is consistent with the entire theory of the act * * *.[2]
It is important to note that the report placed emphasis on both the cessation of the shareholder’s interest and the consistency between taxing liquidation distributions at capital gains rates and the overall policy of the tax law.
In 1951, in preparing the new revenue code for consideration by the Congress, the conference committee rejected a proposal in the House bill[3] which would have prohibited withdrawal of corporate earnings and profits at capital gains rates by liquidation followed by reincorporation:
* * * It is the belief of the managers on the part of the House that, at the present time, the possibility of tax avoidance in this [liquidation-reincorporation] area is not sufficiently serious to require a special statutory provision. It is believed that this possibility can appropriately be disposed of by judicial decision or by regulation within the framework of the other provisions of the bill. * * * [4]
Thus, not only did Congress recognize the possibility of tax avoidance by liquidation followed by reincorporation, but it specifically placed the burden of preventing such avoidance upon the courts.[5]
As the structure of the tax law indicates, Congress intended, as a general rule, to treat corporate distributions as dividends, taxable at ordinary income rates. So long as a shareholder retains his equity in a corporation, the returns produced by his investment will be taxable as ordinary income. As an incentive to investment, however, Congress has provided, as a privilege, an exception to the general rule. A special tax rate is generally applied to the distributions over and above a shareholder’s equity received by him at the time *313 bis interest in tbe business is terminated, whether by sale to the corporation or a third party or by liquidation. Therefore, the fact that a shareholder is “getting out of the business” has been an implicit and underlying prerequisite to the favorable tax treatment of distributions in liquidation of a corporation.[6]
In the instant case, Simon owned by far the greatest amount of stock in both KES and KEB. When the subcontracting business was transferred from KES to KEB, Simon continued to control that business and to receive returns upon his investment in it as fully as if KES had never given it up. Therefore, whether it was intended or “planned” or not, since the business was still being carried on, the distribution of the accumulated earnings and profits of the subcontracting business — albeit delayed until the formal dissolution of KES — was in substance no different than a distribution made by KES would have been if made while it was carrying on that business itself. Therefore, the decision of the majority in this case permits a bail-out at capital gains rates of earnings and profits which, in my opinion, Congress intended should be taxed at ordinary income rates. To hold as the majority does defeats the policy underlying the applicable statutes.
To rely on mere form here is to ignore the substance of the transactions involved. The subcontracting business was transferred from one corporation effectively owned and controlled by Simon to another. The profits from that business were distributed to its shareholders. The formal elements of the situation here were (1) the postponement of the distribution of the assets until the formal dissolution of KES;[7] (2) the existence of KEB prior to the dissolution of KES, instead of its creation thereafter; and (3) the continuation of KES in form after its cessation of the carpentry business. None of these elements change the substance of what happened for tax purposes. To allow the mere dissolution of KES, the vehicle by which the earnings and profits of the subcontracting business were distributed, to control the tax treatment *314 of the distributions to plaintiff would defeat congressional policy as I interpret it.
Four courts have considered analogous “liquidation-reincorporation” problems. Two of them, the Tax Court and the Second Circuit Court of Appeals,[8] have viewed the mere dissolution of the corporation under applicable state law as sufficient for purposes of section 331. In the other two cases,[9] the Fourth and Fifth Circuit Courts of Appeals felt bound to effectuate what they felt to be controlling congressional policy and refused to accept as sufficient in this context the dissolution of the corporation under state law. For the reasons stated above, I am compelled to follow the latter approach.
Had the ownership and control of both corporations here been appreciably different, or, for example, had the subcontracting business been stopped altogether and then revived at a later date,[10] the result I think appropriate here might not have been correct. In either hypothetical situation, it is conceivable that the operation of the subcontracting business by the first corporation may have been sufficiently unconnected with the business in the hands of the second corporation that the business as originally operated could be deemed to be “completely liquidated.”
Whether a business is completely liquidated in any particular case, however, will depend on its unique facts, such as, for example, the ownership and control structures of the corporations involved. Similarly, the existence of “good business reasons” may at times be important to the objective resolution of the question. I do not purport, however, to decide any case but the one before us. The subcontracting business under consideration here was never terminated in substance, but was merely embodied within a different corporate shell. The facts of this case establish business continuity so clearly that the existence or nonexistence of good business reasons is unhelpful, if not immaterial.
*315 For the reasons stated above, I believe that, to be consistent with congressional policy, we cannot find that KES “completely liquidated” its carpentry subcontracting business, and I would therefore hold that all earnings and profits distributed by KES upon its dissolution which were attributable to the subcontracting business cannot be given capital gains treatment under section 331.
II
Plaintiff’s contention that the distributions in issue should be taxed at capital gains rates because they were in partial liquidation of the corporation under sections 331(a) (2) and 346 is without merit. Distributions are usually deemed to be in partial liquidation of a corporation when effected for purposes of corporate contraction, but without termination of the corporate operations.[11] As the statute indicates on its face, the existence of a partial liquidation is determined by an examination of transactions at the corporate level, as opposed to a consideration of the effect such actions might have upon any particular shareholder. Under the facts, the distributions in question were clearly not part of a “series of distributions in redemption of all of the stock of the corporation pursuant to a plan,” so as to qualify under section 346(a) (1). Moreover, the distributions were not in redemption of part of the stock pursuant to a plan under section 346(a)(2), nor was the corporation engaged, immediately after the termination of the subcontracting business, in a trade or business actively conducted in any appreciable way within the 5 years preceding the dissolution. KES became actively involved in large-scale contracts only subsequent to July 1960. Therefore, the requirements of section 346(b) (2) are not met. I would therefore find that no partial liquidation of KES occurred.
III
I would also hold that plaintiff’s assertions that the distributions were not essentially equivalent to dividends under section 302(b) (1) (so that they would be viewed as being *316 in exchange for stock under section 302(a)) are also without merit. Whether distributions within the ambit of section 331, but which do not qualify as being in complete liquidation of a corporation, can ever be treated under section 302 is open to question. That question need not be decided here, however, since plaintiff can in no way avail himself of the “safe harbors” of section 302 (b).
In the first place, as stated in part I of this opinion, it is believed that the distributions in question were identical in effect (because of the continuity of the business and its ownership and control) to dividends KRS might have paid while operating the subcontracting business. Therefore, noncompliance with the conditions of section 302(b) (1) would seem to bar plaintiff’s recovery.
Secondly, under the constructive ownership of stock rules of section 318(a), applicable to plaintiff through the exception in section 302(c) (2) (B) to the exception in section 302(c) (2) (A) to the general rule stated in section 302(c) (1), plaintiff trust was identified with Mr. Simon in his ownership and control of KRS. Since, as I would have held, policy considerations prohibit a finding that KRS was completely liquidated, plaintiff — identified with Simon in his continuity of interest and control — should not be permitted to avoid the impact of that finding and to defeat what I believe to be the intent of Congress by receiving capital gains treatment under section 302. Therefore, despite the fact that plaintiff might appear to be within the terms of section 302(b) (3), recognition and enforcement of the controlling tax policy require a finding that the distributions were substantially equivalent to dividends.
CONCLUSION
For the reasons stated, I would find that the subcontracting business of KRS was not completely liquidated in terms of section 331 and that the distributions to plaintiff were not in partial liquidation of the corporation, but were substantially equivalent to dividends. I would therefore rule for defendant and permit the taxation of the KRS distributions to plaintiff trust at ordinary income rates.
*317 APPENDIX
INTEENAL EEYENÜE CODE OF 1954:
SEC. 301. DISTEIBUTIONS OF PEOPEETY.
(a) In General. — Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).
$ $ $ ‡ ‡
(c) Amount Taxable. — In the case of a distribution to which subsection (a) applies—
(1) Amount constituting dividend. — That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.
* * * * *
(26 U.S.C. 1964 ed., Sec. 301.)
SEC. 302. DISTEIBUTIONS IN EEDEMPTION OF STOCK.
(a) General Buie. — If a corporation redeems its stock (within the meaning of section 317 (b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.
(b) Redemptions Treated as Exchanges.—
(1) Redemptions not eguwalent to dividends. — Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.
* * * * *
(d) Redemptions Treated as Distributions of Property. — Except as otherwise provided in this subchapter, if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.
$ ‡ ‡ $
(26 U.S.C. 1964 ed., Sec. 302.)
SEC. 316. DIVIDEND DEFINED.
(a) Genercd Rule. — For purposes of this subtitle, the term “dividend” means any distribution of property made by a corporation to its shareholders—
(1) out of its earnings and profits accumulated after February 28,1913, or
*318 (2) out of its earnings and profits of the taxable year * * *
Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * *
* * * *
(26 U.S.C. 1964 ed., Sec. 316.)
SEC. 317. OTHER DEFINITIONS.
* * * :I: *
(b) Redemption of Stock. — For purposes of this part, stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property, whether or not the stock so acquired is cancelled, retired, or held as treasury stock.
* $ ü: ¡H *
(26 U.S.C. 1964 ed., Sec. 317.)
SEC. 331. GAIN OR LOSS TO SHAREHOLDERS IN CORPORATE LIQUIDATIONS
(a) General Rule.—
(1) Complete liquidations. — Amounts distributed in complete liquidation of a corporation shall be treated as in fu]l payment in exchange for the stock.
ip # Jp Jp
(b) Nonapplication of Section SOI. — Section 301 (relating to effects on shareholder of distributions of property) shall not apply to any distribution of property * * * in partial or complete liquidation.
* * * * *
(26 U.S.C. 1964 ed., Sec. 331.)
SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS.
(a) General Rule.—
(1) In general. — No gain or loss shall 'be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.
% sp % sp
Gross reference.— *
b) Exception.—
*319 (1) In general. — Subsection (a) shall not apply, to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a) (1) (D), unless—
(A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and
(B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.
$ ‡ $
(26 U.S.C. 1964 ed., Sec. 354.)
SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION.
(a) Gain on Exchanges.—
(1) Recognition of gain. — If—
(A) section 354 or 355 would apply to an exchange but for the fact that
(B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money, then the gain, if any, to the recipient, shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.
(2) Treatment as dividend. — If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend? then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.
*¡¡» »í» «I*
(26 U.S.C. 1964 ed., Sec. 356.)
SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.
(a) Reorganization.'—
(l) In general. — For purposes of parts I and II and this part, the term “reorganization” means—
‡ ‡ $
(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately *320 after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354,355, or 356;
‡ ‡ #
(26 U.S.C. 1964 ed., Sec. 368.)
TREASURY REGULATIONS ON INCOME TAX (1954 Code):
SEC. 1.301-1 RULES APPLICABLE WITH RESPECT TO DISTRIBUTIONS OF MONEY AND OTHER PROPERTY.
^ $
(e) Transactions treated as distributions. A distribution to shareholders with respect to their stock is within the terms of section 301 although it takes place at the same time as another transaction if the distribution is in substance a separate transaction whether or not connected in a formal sense. This is most likely to occur in the case of a recapitalization, a reincorporation, or a merger of a corporation with a newly organized corporation having substantially no property. * * *
íJí # ❖ ❖ H*
(26 C.F.R., Sec. 1.301-1.)
SEC. 1.331-1 CORPORATE LIQUIDATIONS. * * *
# ❖ ❖ * *
(c) A liquidation which is followed by a transfer to another corporation of all or part of the assets of the liquidating corporation or which is preceded by such a transfer may, however, have the effect of the distribution of a dividend or of a transaction in which no loss is recognized and gain is recognized only to the extent of “other property.” See sections 301 and 356.

%

(26 C.F.R., Sec. 1.331-1.)
*321 Findings of Fact
The court having considered the evidence, the report of trial commissioner Franklin M. Stone, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff (hereinafter sometimes referred to as the “taxpayer”) , is an inter vivos trust created and existing under a certain trust agreement dated December 31, 1958. Arline A. Simon, the trustee of the trust, is duly qualified and acting as trustee. The trust is situated, and the trustee resides, in Parma, Ohio. Plaintiff brings this action to recover federal income taxes paid by it for the year 1961.
2. Plaintiff owned shares of stock in the K. R. Simon Construction Co. (hereinafter sometimes referred to as “KRS” or the “Simon Co.”), an Ohio corporation engaged principally as a carpentry subcontractor in the construction business. KRS ceased doing business in 1961, and it was completely liquidated during that year under and in accordance with Ohio law. During the same year, KRS distributed all of its assets and properties to its shareholders in exchange for all of KRS’s outstanding shares of stock. Plaintiff received its share of such distributions. The issue in this case involves the proper tax treatment of amounts distributed to plaintiff by KRS in 1961.
3. Kenneth R. Simon (hereinafter sometimes called “Mr. Simon” or “Simon”) is the husband of Arline A. Simon, the trustee of the plaintiff trust. Simon first entered the construction business in 1948 as an apprentice carpenter with a large general contracting firm located in Cleveland, Ohio, which was engaged in commercial construction work. After serving a three-year apprenticeship, he became a carpenter foreman and worked for the company another two years in the capacity of a job superintendent. After leaving this company in 1953, Simon continued working as a carpenter and foreman for general contractors doing home building until May 1955. At that time he formed a proprietorship which carried on a carpentry subcontracting business only for about 'a year and then branched out into the general contracting field to a very *322 limited extent.[1] The principal reason Simon originally restricted the initial operations of the proprietorship to the subcontracting business was because it required a very limited amount of capital. His long-range plan was to become a general contractor in the home-building field and ultimately become a commercial contractor.
4. KES was incorporated in the State of Ohio on December 19, 1957, with 250 shares of no-par common stock authorized. All of its shares were issued to Kenneth E. Simon, father of Eoss Michael Simon, the beneficiary of the plaintiff trust. KES took over and continued the business of the proprietorship run by Mr. Simon in a tax-free corporate reorganization on March 1, 1958. The proprietorship was incorporated for the primary purpose of limiting Simon’s personal liability.
5. KES started in business on March 1, 1958. Its fiscal and tax years ended on May 31. A balance sheet attached as Exhibit B to a United States Gift Tax Eeturn, Form 709, dated April 14, 1959, and a balance sheet (Schedule L) attached to a United States Income Tax Eeturn, Form 1120 (for the period beginning March 1, 1958, and ending May 31, 1958), dated November 13, 1958, both signed and filed by Kenneth E. Simon, as Donor and President of K. E. Simon Construction Co., respectively, reflect in part that KES began business operations with the following assets purchased from “K. E. Construction Co. Proprietorship at Book Value”:
Assets:
Current: Accounts receivable_$5,248.27

Fixed:

Equipment (net)_ 796.85
Auto and truck (net)_ 4, 712.10
Office furniture and fixtures (net)_ 427.98
Total assets_11,180.20
*323 The above-mentioned balance sheets also show that on the same date KES had the liabilities and capital indicated below:
Liabilities:
Accounts payable_$10,680. 20
Total liabilities_ 10, 680.20
Net worth_ 500. 00
The above net worth figure of $500 represents the book value of the 250 shares of no-par common stock issued to Kenneth E. Simon (Finding 4).
6. During the first three months of its business operations, i.e., the period from March 1 to May 31, 1958, inclusive, KES had gross receipts of $142,220 and net income, before federal income taxes, of $34,010.63. During the balance of the calendar year, i.e., the next seven months commencing June 1 and ending December 31, 1958, KES had gross receipts of $518,217.14, and net income, before federal income taxes, of $123,864.24.
7. On December 27,1958, KES was recapitalized in a tax-free reorganization. The 250 shares of stock then issued and outstanding were thereafter exchanged for shares of newly authorized capital stock, consisting of 250 shares of Class A voting common stock having a $100 stated value and 250 shares of Class B nonvoting common stock having a stated value of $100 per share which were preferred as to dividends. The recapitalization resulted in $49,500 being transferred from the Earned Surplus account to the Capital Stock account on the books of KES, although no new capital was contributed to the corporation.
8. On December 31,1958, three separate irrevocable trusts, including plaintiff, were established at the instance of Kenneth E. Simon. The beneficiaries of these trusts are the three sons of Mr. Simon, namely, Eoss Michael Simon, Eichard Eugene Simon and Eobert Keith Simon, all of whom were then minors between two and eight years of age. Arline *324 Simon, the mother of the above-named beneficiaries, is the trustee for each of the trusts.
9. On December 31,1958, December 31,1959, and March 31, 1960, Mr. Simon made gifts to each of the trusts of 30, 15, and 15 shares, respectively, of the corporation’s Class B stock held by him, and he filed federal gift tax returns for the years 1958, 1959, and 1960, reporting such gifts. The shares were valued at book value in said returns and the value of each share given was determined to be $173.56, $323.79, and $382.12 on the three dates of the gifts.
The above-mentioned gift tax returns all contain the following statements:
It [K. E. Simon Construction Co.] is engaged in the building contracting business, a highly-competitive business subject to high risks and severe cyclical ups and downs.
The success of the Corporation is largely dependent upon its president, K. E. Simon.
$ $ H* $ ‡
Since the Corporation had been in business for only * * * months when the gifts were made and hence had an insufficient history of earnings upon which to base a determination of the stock’s value, and because of the very high risk involved in the Corporation’s business and its almost complete dependence upon its president for its success, the value of the Corporation’s stock on [the respective dates of the gifts] cannot be more than its book value. * * *
In addition to the foregoing, the gift tax return for the year 1960, filed on April 1, 1961, contains, among other information, the following statement: “Since the date of the gift, March 31,1960, there has been a decline in the building contracting field.”
10. As of April 1,1960 (after the gifts described in Finding 9), Mr. Simon held all 250 shares of the Class A voting common stock and 70 shares (28 percent) of the Class B nonvoting stock of KBS, and each trust held 60 shares (24 percent) of Class B nonvoting stock of KES. All stockhold-ings remained the same from said date through the remaining existence of the corporation.
*325 11. The parties are in sharp disagreement with respect to the reasons and purposes underlying the establishment of the trusts and gifts mentioned hereinbefore. The contentions and arguments advanced by the parties with respect to this issue of fact are set forth in such a minute and lengthy manner that no attempt will be made to summarize these matters in any detail. Plaintiff disputes defendant’s contention that one of the principal reasons Mr. Simon established the trusts and gifts in question was the avoidance of federal income taxes. Defendant does not, however, show any legal consequences to follow if this were so, and therefore we decline to inquire into the issue.
12. After the proprietorship was incorporated and began operations as KES, the primary business of the corporation was carpentry subcontracting in the home building field.[2] It also engaged in general contracting business on a small scale.[3] As a carpentry subcontractor, KES performed the carpentry labor, on a bid basis, for general contractors in the home construction field. It provided labor but no materials. Its main cost of operation was wages for carpenters.
13. The office of KES was located in the basement of Mr. Simon’s house on Doxmere Drive in Parma Heights, Ohio, a suburb of Cleveland. Mr. William Bobertson, a public accountant, was employed part-time to keep the books of the proprietorship, and he continued to work for KES on the same basis. Mr. Bobertson was the Vice President of KES but did not own any stock in the corporation. Mrs. Simon kept the payroll records and performed routine office work. KES’s corporate income tax return, dated November 13,1960, reflects that as of May 31, 1960, it had current liabilities in the amount of $86,508.32; Class A and Class B capital common stock, in the amount of $500; capital surplus in the *326 amount of $49,500; earned surplus in tire amount of $132,-082.45 (total liabilities and capital — $268,590.77); and the following assets listed at their cost:
Cash _ $26,760.41
U.S. obligations_ 190,000.00
Fixed (depreciable) assets (listed at cost: $13,327.24, less depreciation: $4,597.28- 8,730. 36
Other (nondepreciable) assets (consisting of) :
Deposit — Sayings and loan company- $10,000.00
Deposit — Workmen’s compensation- 7, 800.00
Beal estate_ 25,300. 00
Total_ 43,100.00
Total assets_ 268,590. 77
The fixed depreciable assets listed in the above table consisted of (1) “Equipment,” including two or three power DeWalt saws, electric generators to run power tools, automatic nailing machines and a compressor to run the power nailers, having a total cost value of $3,201.90; (2) “Wagons and Trucks,” which included two trucks, an old army ambulance used as a supply vehicle, and a station wagon, having a total cost basis of $9,409.36; and (3) “Furniture and Fixtures,” which included an adding machine, a typewriter, a check protector, file cabinets and an old desk, having a total cost basis of $716.38. It is apparent from the above that the total cost basis of the above-listed fixed depreciable assets amounted to $13,327.24, and the depreciated value thereof, as of May 31, 1960, totaled $8,730.36.
During the fiscal year ending May 31, 1960, KRS purchased small tools, including a number of various kinds of power saws, at a cost of $5,322.79, which it deducted as a part of its cost of operations expense.
14. The success of KBS was completely dependent upon Mr. Simon. He ran the business, and the public generally knew that he was the owner and dealt with him. He was the person primarily responsible for obtaining new business, entered into contracts and saw that they were carried out, employed the workmen required to perform the work, made collections and estimated contracts. During the corporation’s *327 tax years ended May 31, 1959, and May 31, 1960, Simon received a salary from the corporation at the rate of $300 per week, plus two percent of the corporation’s net billings, which amounted to $27,900 and $42,613, respectively, in those two years. KES’s success also was enhanced by its reputation for honesty, fair dealing, quickness in completing work required under its contracts, and for other services such as skill in estimating jobs, the availability of cash required to meet large current payrolls, and an aggressive collection policy. Another important factor in KES’s success was that it employed skilled, reliable carpenters and foremen. Generally speaking, carpenters do not work for a single job contractor and such workmen are drawn from a pool by various contractors and subcontractors in the course of a year. However, while KES hired carpenters as they were needed, either through the union hiring hall pool or want ads, the corporation maintained a “key crew” of about 20 carpenters, including nine or ten who were qualified to act as foremen.
15. In 1955, Mr. Simon’s proprietorship commenced doing carpentry subcontracting business with Messrs. Alvin Siegal and Carl Milstein, who operated a group of related building corporations, including Alvin Builders, known as the Alvin companies (hereinafter sometimes referred to as “Alvin”), which engaged in building homes in large housing development projects. After the proprietorship was incorporated as KES, it continued to carry on this business relationship with Alvin, which was the corporation’s primary account, and it did a great deal of the carpentry subcontracting work on Alvin projects until sometime in July 1960. At that time, as explained hereinafter, the business relationship between KES and Alvin changed, but KES continued to perform a substantial amount of subcontracting work for Alvin until sometime in December 1960. Although during the period commencing in July 1960 and ending in December 1960, KES did considerably less Alvin carpentry subcontracting work and had fewer receipts from this source than another corporation (KEB — see Findings 20 and 37(a)) employed by Alvin Builders, the major portion of KES’s total receipts during the last half of the year 1960 was derived from car *328 pentry work done for Alvin Builders and other Alvin companies. (Finding 37(b).) KES did not work for Alvin exclusively, and up until sometime in 1961, KES did most of the substantial carpentry subcontracting work required by a builder named Peter Ezepka who operated through a number of different corporations. Until KES was liquidated in the summer of 1961, it also did a substantial amount of work for two building corporations known as the Homestead Company and the New Haven Company in both of which a Mr. George Groynom and a Mr. A1 Simon each owned a 50 percent interest (sometimes hereinafter referred to as the “Groynom” account). KES had receipts from Homestead commencing as early as June 1959 and had its first receipts from New Haven on October 7,1960.
16. (a) An analysis of KES’s bank deposit records for the year June 1, 1959 through May 31, 1960, shows that its receipts were derived from the following sources:
Per-Amonnt cent
$1,171,318.34 85.4 Alvin companies_
96, 745. 00 7.1 Peter Ezepka companies
49,910. 00 3. 6 Groynom
Others:
Goudreau $20,104. 00
Elwood 14, 525. 00
Bacon_ 8, 500.00
Morris_ 5,170.00
Coury (Tr. 330; Pltf. Ex. 3)__ 1,177.00
Dick_ 1.008.40
Deacon _ 1, 000.00
Elliot_ 900.00
Suesse_ 622.12
Sheldon_ 50.00
Lovelle_ 35.00 53, 091.52 3. 9
Total_ [4]1,371, 064. 86 100.0
*329 The receipt from “Sheldon” represented the final payment on a general contracting job performed in 1959 (Footnote 3). While the record shows that subsequent to May 31,1960, KRS had a relatively small total of other receipts from general subcontracting work, it does not disclose whether such work was performed prior or subsequent to May 31, 1960.
The other receipts listed above were from carpentry subcontracting.
(b) There were additional receipts of $21,508.69 which are not identified on the bank deposit records, and an item of $432.19 which represented a reimbursement by an employee for some materials the company had purchased for him.
17. (a) KRS and Alvin maintained a close business relationship and it appears that the crews assigned by KRS to work on Alvin projects normally included individuals comprising the “key crew” maintained by the corporation, particularly William Nakoff and Edward Zaremba, who were very familiar with Alvin’s operations.
(b) The record shows that although at least two carpentry subcontractors bid on each Alvin job, the job was normally awarded to the lowest bidder with a commitment to do work on a certain number of houses, and that although KRS was not always the successful bidder, it did a substantial part of the carpentry work required on Alvin projects. During its business relationship with KRS, Alvin did not enter into written contracts obligating itself to build any particular number of houses on a certain street or in a certain area; therefore, upon reasonable notice, Alvin was free to call off any work which KRS had not already started and to employ another carpentry subcontractor to do work on other houses to be constructed. Before KRS submitted a bid, it talked and reviewed with Alvin the job to be done, how the houses were to be built and when they were to be completed.
(c) Alvin followed the custom and practice of other builders in the area of inviting new bids when they started a new street or subdivision depending upon how large a project was involved. In the spring of each year the carpenters’ union negotiated with carpentry subcontractors for new wage terms, and as a result such subcontractors made new bids *330 approximately in May of each year. The prices KRS charged Alvin for doing the carpentry subcontracting work were renegotiated periodically when changes were made in the houses under construction.
18. (a) Sometime in 1958, Messrs. Milstein and Siegel indicated to Mr. Simon that they would like to have him form a separate corporation for the purpose of doing only Alvin business. Credible and acceptable testimony was presented by Milstein and Siegel to the eifect that the basic reasons why they wanted Simon to take such action and considered this desirable were (1) Alvin looked to KRS to correct carpentry work improperly done and to make necessary repairs for which Alvin was responsible under a one-year warranty it was required to give at the time each house constructed was sold; and (2) Alvin felt this would assure that an adequate and dependable carpentry work crew familiar with its type of operations would be available at all times, particularly during the summertime when there was a shortage of carpenters. Alvin normally paid KRS weekly and did so promptly, at least until about 1960, when payments started slowing down. Alvin was concerned over the fact that KRS was engaged in doing other jobs and bidding on some work which Alvin considered to be a little more speculative than its own. Alvin feared that KRS might get into “trouble” on one of its other jobs, thereby jeopardizing the Alvin work, and did not like the idea of the corporation’s being able to use money received from Alvin to meet obligations arising out of other KRS operations. It appears from the testimony that Alvin viewed the business activities of KRS with other builders as a threat to its financial ability to discharge the one-year guarantee obligations owed to Alvin.
(b) When the suggestion was first made to Mr. Simon that a separate corporation be formed to do the Alvin work exclusively, he considered the matter but put off taking action because he did not understand the logic of Alvin’s idea. Thereafter, during the years 1959 and 1960, Alvin pressed its proposal and Simon continued to resist the plan. The record indicates that during this same period of time, Alvin was primarily concerned with working out some kind of arrangement with KRS that would insure that necessary repairs re *331 quired under Alvin’s one-year warranty would be made by KRS; that the suggestion that a separate corporation be organized to do only its work was one alternative solution to the guarantee protection problem; that Alvin suggested, as another alternative solution, that KRS enter into a written guarantee arrangement; and that Alvin also proposed that KRS deposit sufficient funds in escrow to cover the expense of performing necessary repair work; that while KRS did necessary repairs, Simon was reluctant for KRS to enter into a written undertaking with Alvin concerning them, or to form a separate corporation; and that Alvin never insisted that KRS take any one of the above-outlined actions to the extent Simon was told that KRS would not be allowed to bid on Alvin jobs if it did not do so.
19. Edward Zaremba and William Nakoff were two of the several foremen employed by KRS and they were the principal foremen on the jobs the corporation handled for Alvin. They were elected Assistant Vice President and Assistant Secretary, respectively, of KRS on December 10, 1959; but neither of these individuals owned any stock in the corporation and it does not appear that either of them was reelected as an officer after said date. The testimony is conflicting as to whether Messrs. Zaremba and Nakoff desired a part of a separate carpentry subcontracting business of their own or simply a substantial interest in KRS. As best it can be determined from the record, they initially wanted a stock interest in KRS. The evidence does not disclose when these two individuals first indicated to Simon their interest about the matter. Zaremba and Nakoff had worked for Simon since the beginning of his business and he felt they were deserving of an interest therein. However, the testimony shows that they did not have sufficient money for investment purposes to purchase more than a small percentage of the stock in this large company, which would have given them relatively little incentive to seek new jobs, and that they wanted to 'build up the business of a company. It appears that because of the aforestated reasons, the idea of Zaremba and Nakoff’s buying KRS stock was dropped by mutual agreement.
20. In June 1960, after first actively considering the formation of a separate company several months previously and *332 following discussions with prospective shareholders, Alvin’s representatives, and Mr. Simon’s attorneys, it was decided to form a separate corporation. Thereafter, on July 15, 1960, the KEB Construction Company (hereinafter sometimes referred to as “KEB”) was incorporated. While the evidence does not disclose what business the incorporators indicated the corporation would engage in, the record shows that the principal business activity actually carried on by the corporation was “carpentry subcontracting.”
21. (a) Despite certain facts which raise some questions and provide a limited support for suggested inferences to the contrary, it is concluded and found that KEB was formed with the original intent and primary purpose of having it do all the new Alvin work exclusively; that there were two principal reasons for this action’s being taken: (1) Alvin (for reasons explained hereinbefore) had requested and pressed Mr. Simon over a long period of time to form a separate company to do Alvin work alone; and (2) two of KBS’s original and principal employees, i.e., Messrs. Zaremba and Nakofl, wanted and insisted upon having a substantial part of a business of their own.
(b) Other reasons for forming KEB to do the Alvin work included the fact that (1) it was felt this action would expedite collections from Alvin (a company like KEB, with a substantially smaller amount of capital than KES, could and did insist upon Alvin making weekly payments promptly and Alvin agreed to resume doing so, which enabled KEB to be capitalized with a minimum amount of money); (2) some other builders doing business with KES were somewhat concerned about its relationship with Alvin because it had grown so quickly, and they were reluctant to have KES bid on their work because of their unwillingness to be too closely associated with Alvin; (3) Simon was engaged in carpentry subcontracting work to such an extent that he did not have sufficient time to actively develop KES’s business operations in general contracting and in the commercial field. (Simon testified that he felt that if a separate company was formed to do the Alvin subcontracting work, this would eventually free about half of his time which he could use to seek general contracting work and look into the commercial field.)
*333 (c) Considering the foregoing facts and the record as a whole, it is concluded and found that KEB was organized for valid business reasons and not for the purpose of tax avoidance.
22. At the time KEB was organized, the condition of KES’s business was very good and was expected to get better because the climate of the real estate business generally was favorable. It is true that the known consequence of the plan to form KEB was that KES would not be awarded any new Alvin contracts which represented about 85 percent of its business. However, KES had a substantial amount of unfinished and committed work to perform on Alvin projects from which it expected to derive substantial receipts and actually did so. KES was then doing carpentry subcontracting work for other builders, and getting new work of this kind from various sources. Furthermore, in addition to continuing to perform carpentry subcontracting work, Simon planned to expand and broaden KES’s business operations by developing substantial work in the general contracting field, in large commercial and public construction, and in land development. Mr. Simon planned to devote at least 50 percent of his time to KES’s business after Zaremba and Nakoff were trained and sufficiently experienced to enable them to do the estimating and run the field operations, respectively, of KEB. While in fact after KEB started in business Mr. Simon ran KES himself, the record suggests that he necessarily devoted a considerable amount of his time to KEB’s affairs.
23. KEB’s total capital was $20,000 in cash. The shareholders in this corporation, the amount of cash which each of them contributed, and the percentage of stock interest they respectively acquired are shown below:
Shareholder Cash contributed Stock interest (percent)
Kenneth R. Simon_ $16,000 80
Edward Zaremba_ 2,000 10
William Nakoff_ 1,000 G
William R. Robertson.. 1,000 6
*334 Nothing else but cash was contributed by any of the shareholders.
As previously indicated, Messrs. Zaremba and Nakoff had been employed as foremen by KBS, and Mr. Bobertson was a public accountant who was employed on a part-time basis to do KBS’s accounting work. All of these persons had been serving as officers of KBS.
24. Although the evidence will not support an unequivocal finding on this point, it may be reasonably inferred that because of KEB’s modest capitalization, initially it probably could have done the volume of business it did with Alvin for few, if any, other builders in the Cleveland area. The above limited inference is justified by reason of the fact it appears that most of said builders paid for carpentry subcontracting work performed on their behalf once or twice a month; that sometimes it would be close to 60 days before KBS was paid by some builders, and that the record does not disclose that any other builders would have been willing to make weekly payments to KEB whereas Alvin gave assurance that KEB would be paid promptly each week.
25. The size of KEB’s capital structure was fixed both in light of a business judgment as to the minimum needs of the corporation in starting business operations, performing the Alvin work, and the amounts of cash which Messrs. Zaremba, Nakoff and Bobertson could afford to invest.[5]
26. (a) The size of each individual shareholder’s interest was determined by the amount of cash each shareholder (other than Mr. Simon) was able to afford (see footnote 5). Considering credible and acceptable testimony presented by Simon in light of the record as a whole, it is found that he would have been willing to take less than an 80 percent *335 stock interest in KEB and took that particular interest because the other shareholders could not afford to make a greater investment than they did; that Simon had in mind unstated plans for the future to reduce his percentage of stock ownership in KEB by selling some of his stock back to the corporation and would have been willing to do this to the point that he retained only a 25 percent interest; and that Simon felt that after he had reduced his stock interest in KEB and the other shareholders had gamed more experience, they could operate the corporation with or without him.
(b) In rejecting defendant’s argumentative objections to the foregoing findings and its speculative conclusions to the contrary, consideration has been given to all of the facts set forth herein relating to the situation, circumstances, and pressures which prevailed and led to the formation of KEB; for brief example, among others, (1) Alvin’s desire that a separate company be organized to do its work alone; (2) Simon’s feeling that Zaremba and Nakoff, whom he had employed as his principal foremen for a long time, were deserving of a substantial part of a business of their own upon which they were insisting; (3) Mr. Robertson’s familiarity with the financial aspects of KRS’s business and close association with Simon over the years; (4) the limited funds these individuals could afford to invest which made it impossible for them to acquire a substantial interest in KES because of its size and capital stock structure; and (5) Simon’s desire to have more free time in order to carry out his long-range plans to develop general contracting business and get into the commercial building field.
(c) The record shows that the intent of Simon to reduce his stock ownership interest in KEB was not carried out; that at all times he had no less than an 80 percent interest in said corporation; and that he ended up with an 88.8 percent interest when Zaremba resigned from KEB in May 1963.
27. On or about July 21,1960, KEB began operations and started doing carpentry subcontracting work for the Alvin companies through a single company, namely, Alvin Builders. KEB shared the office quarters which KES maintained in *336 Simon’s borne and used KES’s office equipment located there. KEB did not have a separate telephone listing at first, but obtained one when the next listing came out. Mr. Bobertson and Mrs. Simon kept the books and payroll, respectively, for both KES and KEB.
28. KEB initially had only cash and owned no other physical assets at this time. During approximately the first three months or so of operations, extending to October 31, 1960, KEB rented from KES a truck, an old army ambulance vehicle used for storage purposes, and a few electric saws. During the same period, KEB expended cash in the amount of $4,845.50 for small tools, $1,369.71 for supplies, $4,722 to make a workmen’s compensation deposit with the State of Ohio, $169 to purchase (on October 31, 1960) a power saw from a dealer, and $1,250 to purchase (on October 31, 1960) the two above-mentioned vehicles which it had been renting from KES up to that time. No other property was sold or transferred to KEB by KES. While it is apparent from the above that some of KES’s physical assets which were necessary to KEB’s operations found their way into KEB’s hands, either through rental and/or sale, the record discloses that KEB also purchased items required in its business from sources other than KES. As of October 31, 1960, KEB had physical assets consisting of the two vehicles purchased from KES, small tools, supplies and equipment, as well as said workmen’s compensation deposit, accounts receivable for work in process, and a cash balance of $113,582.58. KEB’s profit before federal income taxes for the period July 21, 1960 — October 31, 1960, was $80,943.21, and it paid income taxes thereon of $36,590.47.
29. Many of the carpenters who worked for KES on Alvin projects became employees of KEB after it started in business. Included were the employees and foremen comprising KES’s “key crew.” (See Finding 14.) KEB’s first payroll was for the week ended July 27, 1960. Forty-six of the 56 employees on that payroll had been employed by KES during the previous week. A good number of carpenters was steadily employed by KES and/or KEB during the period beginning in July 1960, and ending sometime in December 1960. Many *337 of these carpenters worked for KES one week and for KEB the next; but none of them were employed by both corporations in a single week and a few changed more than once from one company to the other. While the record is not entirely clear, as best it can be determined, KES had nine key foremen at the time KEB commenced doing carpentry work, six of whom, including Messrs. Zaremba and Nakoff, worked for KEB during the period July 1960 — December 1960. Two of the three remaining foremen went to work for KEB at later times.
30. Eepresentatiyes of Alvin were aware of the fact that KES and KEB were separate companies and that KEB had new shareholders, including Messrs. Zaremba and Nakoff. Alvin knew that Mr. Simon was connected with KEB but apparently he did not know of Mr. Eobertson’s interest therein.
31. After KEB was organized, Zaremba and Nakoff continued to work for KES for a week or two, during which time they completed the work they had for KES, and then went on KEB’s payroll. Except for consultation by Zaremba on carpentry techniques, new ideas, and matters of that general nature, neither of the above-named individuals did any work for KES after he was taken off the latter’s payroll, and neither one of them was paid for any period after he started to work for KEB. Nakoff moved up from foreman with KES to general foreman with KEB and had charge of field operations. Simon started training Zaremba, who had been general foreman with KES, in making estimates, and after two or three months the latter assumed the duties of figuring, estimating, and bidding substantially all of these jobs, ran the routine day-to-day operations of KEB, and was being broken in to make collections from the builders. During the time KES continued in business, particularly during the first several months, Simon instructed, trained, guided and monitored both Nakoff and Zaremba with a view to helping them gain sufficient knowledge and experience to enable them to take over and run the business themselves eventually. Simon was in the KEB office regularly, ran the financial affairs of the corporation, and took the lead and major responsibility *338 for ba.u filing the important matters, problems and disputes that came up. Neither Zaremba, Nakoff, nor Simon had employment contracts with KEB and each was free to leave at any time. However, considering the substantial stock interest Simon had in the corporation, the fact that KEB had taken over KRS’s major account, i.e., Alvin, and the relative inexperience of Zaremba and Nakoff in running a carpentry subcontracting company, handling financial affairs and performing certain operations, it is clear that Simon had little choice but to keep working for KEB as he continued to do.
32. While prior to the time KEB started doing business with Alvin, Zaremba and Nakoff worked on jobs KES did for Alvin over a long period of time and undoubtedly they had considerable contact with Alvin representatives, Alvin’s business dealings were with Mr. Simon and he was on the jobs a great deal. During the time KEB was doing Alvin work in 1960, Zaremba and Nakoff became closely associated with the two jobs Alvin was then running, i.e., Brook Park and North Eidgefield, and Alvin usually spoke with Zaremba concerning the first-named project and with Nakoff regarding the second one. Simon came around these jobs less than Zaremba. However, since neither Zaremba nor Nakoff was then doing any work for KES, it may be reasonably concluded that Simon had considerable contact with Alvin in connection with the substantial amount of Alvin work KES performed and completed during the period beginning in July 1960, when KEB started doing business, and ending around December 1960, at which time both KEB and KES stopped working on Alvin projects.
33. KES did not transfer to KEB any Alvin carpentry subcontracting business which, prior to the formation of KEB, KES had started or made commitments to perform. KES continued work on Alvin projects until sometime in December 1960, when it finished the projects it had started or agreed to undertake for various Alvin companies, and KES fulfilled its one-year guarantee with respect to such work, but it did not do any new Alvin business after KEB commenced operations in July 1960. KEB did not assume KES’s guarantees or any uncompleted commitments involv *339 ing Alvin lióme construction projects. KES received all of the money due it for work which it performed on behalf of Alvin both prior and subsequent to the time KEB started doing work on Alvin projects through Alvin Builders. After KEB was organized and commenced doing business, it submitted bids on Alvin projects and started performing carpentry work on homes being constructed on new streets in different areas from those in which KES was doing Alvin work. KEB did only Alvin work for the first four months or so after starting business operations. Considering the fact that the record discloses KEB was organized on July 15,1960, started business operations and doing carpentry work for Alvin Builders on or about July 21, 1960, and obtained substantial receipts from Alvin Builders on August 5, 1960, it may be reasonably inferred that careful planning preceded the incorporation of KEB; that prior to that time, certain understandings were reached, or at least tentatively agreed upon by Alvin and the organizers of KEB for the latter to take on new Alvin work within a short time after the corporation was organized, so that the new corporation, with limited capital, could commence doing Alvin business and receive initial payments on work performed as soon as possible.
34. Although one of the two principal reasons why KEB was organized was to give Alvin added protection with respect to the repair guarantee problem and it was thought this particular matter had been solved to Alvin’s satisfaction, the record shows that such was not the case and that Alvin desired additional commitments relating not only to guarantees but also as to other forms of protection. Sometime in September 1960, Alvin requested KEB, as well as other subcontractors representing 16 different trades doing various parts of the work on Alvin projects, to sign agreements providing for such things as performance and liability bonds, written repair guarantees for two years (instead of oral one-year guarantees previously given), liability bonds, assumption of personal liability (by KEB’s principals and their wives), and, waiver of lien rights, as a condition to bidding on new Alvin work. Messrs. Zaremba, Nakoff and Simon decided that they would not sign these *340 agreements, and the latter personally communicated this decision to Mr. Siegel (one of Alvin’s owners) who indicated these problems could be worked out and told Simon that KEB should keep right on working. Thereafter, Messrs. Zaremba, Nakoff and Simon retained an attorney to draft counter-proposals on behalf of KEB, and they, together with their attorney, participated in negotiations with Alvin’s principals to resolve the differences existing between Alvin and KEB. These negotiations continued into the early part of December 1960, when it became apparent that agreement could not be reached and that KEB probably would not be permitted to bid on new Alvin work. It appears that Alvin was first inclined to compromise with KEB, but finally decided not to do so because of difficulties that might be encountered with other subcontractors if KEB were given favored treatment. Both KRS and KEB continued to work on existing Alvin jobs until they were completed sometime in December 1960. In early January 1961, KEB was formally advised to the effect that it would not be given an opportunity to bid on any new Alvin work and since that time KEB has done no new business with Alvin. While subsequent to January 1961, both KEB and KRS had receipts from Alvin, it appears that these receipts were in payment for work performed for Alvin prior to said date.
35. While the record is not entirely clear, it appears that as early as 1959, Alvin had been considering doing its own carpentry subcontracting because Alvin principals thought they might be able to do the work for less money; that possibly in about December 1960, though more probably around December 1959, Alvin formed a corporation named the Camel Back Construction Company for the purpose of doing this kind of work at some future time, but that the corporation did not undertake such operations until early in 1961, after Alvin had discontinued doing business with KEB in December 1960; and that neither KRS nor KEB became aware of Alvin’s thoughts in regard to possibly doing its own work until after the time KEB was organized. While Mr. Milstein testified to the effect that Alvin discontinued doing business with KEB because Alvin thought it could do *341 the wort for less money, considering the testimony as a whole, it is concluded that KEB did not lose the Alvin account primarily because of the reason given by Mr. Mil-stein, nor primarily because of the “repair guarantee” problem, and it is found that KEB probably would have retained Alvin’s business if KEB had met Alvin’s demands and terms relating not only to “repair guarantees” but also with respect to performance and liability bonds, personal liability, lien right waivers, etc. While it may be said that the aforementioned items come within the general description and category termed “guarantees” and the question is really only one of semantics, the record shows that the differences which led to KEB’s losing Alvin’s business involved demands which were much broader and went far beyond the scope of the “repair guarantee” dispute that had existed over the years between KES and Alvin.
36. There was no reason for KEB or its shareholders to expect or anticipate that Alvin would stop doing business with KEB. While the repair guarantee problem had existed over a period of years prior to the time KEB was organized these and other operating differences had always been resolved. The evidence shows that one of the principal reasons for forming KEB was to give Alvin additional protection with respect to repair guarantees; that KEB was established for the purpose of doing Alvin business exclusively, with the full understanding and expectation on the part of both Alvin and KEB’s principals that the latter corporation would be permitted to bid on Alvin business into the indefinite future. Until Alvin made new and broader demands of KEB, as well as other Alvin subcontractors, in September 1960, KEB had a right to assume, considering the long association its principals had maintained with Alvin and the fact KES and Alvin had always worked out their differences, that any problems which might arise, including those involving guarantees, could be resolved as they had been in the past.
37. (a) During the period from August 5, 1960, the date of KEB’s first cash receipts, through December of that year, all of its receipts, with the exception of a receipt from KES to correct a bookkeeping error, and two receipts totaling *342 $3,400 in late December from a new account not related to Alvin,[6] were from Alvin Builders. Its total receipts in this period (other than inter-company transfers) were $591,346.78. It is apparent from the foregoing that KEB had receipts from Alvin totaling $587,946.78. (See footnote 4.)
(b) During the same period stated above, i.e., August and December 1960, KES had total receipts (other than inter-company transfers) of $413,122.25 from the sources and in the amounts shown below:
Alvin Builders_$20,965. 06
Other Alvin companies_ 224,106.42
Peter Kzepka_ 110, 555.00
Groynom _ 37,945.00
Other _ 19,550.77
Total (Ibid.)...413, 122. 25
The above and evidence in the record show that KES, as well as KEB, had some receipts from “Alvin Builders” and all of the receipts from the “Other Alvin companies.” It should be noted that the above receipts from said sources represented payments for work on Alvin projects which had been committed by KES before KEB was organized and performed by KES either prior or subsequent to the incorporation of KEB; that the Alvin companies included Alvin Builders which was designated the company through which all Alvin work was channeled to KEB; and that (as indicated in Finding 15) the receipts listed above as having come from “Groynom” were actually received from the Homestead and the New Haven Corporations in both of which Messrs. Groynom and Simon each owned a 50 percent interest.
(c) The weekly payrolls of KES during the period January 1, 1960, through July 31, 1961 (see plaintiff’s Exhibit 5), disclose that the average payroll substantially declined throughout 1960 (and the remainder of the time it stayed in existence), after KEB started doing business in July of *343 that year. To illustrate: KRS’s payroll for the period ending July 20, 1960, was $32,436.33 (and never reached that high a figure again). Beginning with the payroll period ending July 27, 1960, during which period (July 20-27, 1960) KEB started doing work for Alvin Builders, the amount was $26,451.93, and during the remainder of that year the payrolls varied between $16,074.79 and $19,470.11 in August; $16,532.05 and $24,174.94 in September; $11,-658.89 and $24,560.74 in October; $2,725.72 and $11,258.05 in November; and $1,134.68 and $4,136.12 in December 1960.
(d) It is clear from the foregoing and other evidence in the record that despite the fact (contended by plaintiff) KRS’s receipts for the first 20 days of July 1960 (before KEB started operations) were $87,962, as compared with $103,822 during the next 20 days (i.e., the first 20 days after KEB commenced doing business), which may be accounted for by assuming KRS had receipts during the last-mentioned period representing payments on some work performed prior to July 21,1960, the volume of new work performed by KRS in 1960 decreased substantially after KEB started doing Alvin work.
38. The evidence will not support a finding requested by plaintiff to the effect that during the time KEB was doing Alvin work, “Zaremba had in fact been running KEB with Nakoff and Simon assisting him.” While Zaremba testified to the effect that he considered himself the “boss” of KEB and “generally” ran the company, and the testimony supports the foregoing as true in a limited sense in that he was a “construction superintendent,” plaintiff admits that at the time KEB was formed, “Simon planned to devote at least 50 percent of his time to the Simon Company once Zaremba and Nakoff were broken into doing the estimating for KEB and running the field.” (Emphasis supplied.) It is apparent from the foregoing and other testimony (see, e.g., the facts set forth in Finding 31 that although after KEB started in business, Simon ran KRS himself and visited the job sites where KEB was working less than he did before KEB started doing Alvin work, he continued to devote considerable time *344 to the business affairs and operations of KEB during the time it was doing Alvin work (and thereafter). It also should be noted that although it appears Simon planned to reduce his stockholdings in KEB after Zaremba and Nakoff had become sufficiently trained and experienced to take over and run the business, these intentions were not carried out and he never relinquished control; that Simon was instrumental in making it possible for KEB to do the Alvin work, which represented about 85 percent of KRS’s carpentry subcontracting business, and it hardly seems reasonable that Simon would allow Zaremba to actually run KEB during the time the latter was still learning how to do so and the volume of KRS’s overall business operations was steadily declining; that Simon maintained a constant interest in the affairs of KEB and rendered invaluable assistance in obtaining new business for KEB after it lost the Alvin account; and that subsequent to its liquidation of KBS in the summer of 1961 Simon devoted full time to KEB’s business. Considering the foregoing and the record as a whole, particularly the fact that Simon was the major stockholder in KEB and the facts set forth in Finding 31, supra, it is concluded that in a real sense, he rather than Zaremba was the “boss” of the corporation and “ran” KEB from the time it started doing business.
39. When it appeared early in December 1960 that it was unlikely KEB would get any more new Alvin business, a meeting of all of KEB’s stockholders was called and held. The evidence shows that a decision could have been made to liquidate KEB, but it was decided to keep the business going and that KEB’s principals, including Mr. Simon, would seek work for KEB. While this decision was the collective product of Messrs. Zaremba, Nakoff, and Simon, it cannot be seriously disputed that the latter, as the holder of 80 percent of KEB’s stock, could have decided to dissolve KEB and concentrate his efforts on developing carpentry subcontracting business for KKS. According to testimony presented by Simon, Zaremba indicated that he would leave KEB if it did not obtain new business, and Simon would have lost both Zaremba and Nakoff in the event a decision had been *345 made to liquidate KEB. When questioned as to whether he had given any consideration to what he might do after KEB lost the Alvin business, Zaremba testified that his “only consideration at this time” was the fact that he was a principal in a newly formed company and that he had not “wanted it to fold,” so he and the other principals quickly “started shopping for new work.”
40. (a) During the period from January 1,1961, through July 12,1961 (see paragraph (c), infra), KEB had an average of 39 persons employed, exclusive of Mr. and Mrs. Simon and Mr. Eobertson.
(b) During the period from January 1,1961, through July 31,1961, KEB had receipts from its carpentry subcontracting business totaling $179,494.54, of which $40,729.76 was received from Alvin Builders (presumably in payment for Alvin work performed in 1960) ,[7] the remainder amounting to $138,764.78 being from other sources. (See footnote 4.) Also see paragraph (d), infra.
(c) During the period from January 1,1961, through July 12, 1961 (the date of its last payroll), KES (exclusive of Mr. and Mrs. Simon and Mr. Eobertson) averaged about seven employees on the payroll. (See and compare paragraph (a), above.) Except for a payroll in the amount of $15,418.20 on March 15,1961, no payroll during that year was more than $1,978.64 (on January 18, 1961) and the payroll varied between that amount to figures under $1,000 as low as $552.80.
(d) KES continued in the carpentry subcontracting business until sometime in March or April 1961, and during the period from January 1,1961, through August 7,1961, it had receipts from said business totaling $63,237.69, of which $36,264.33 was received from Alvin Builders and other Alvin companies (presumably in payment for work performed in 1960), leaving receipts from other builders amounting to $26,973.36, some of which it may be presumed were received in payment of work performed in 1960. See footnote 4. While *346 the time periods are not exactly the same, see and compare paragraph (b),above.[8]
41. Plaintiff does not object to a finding requested 'by defendant to the effect that during the period from January 1, 1961, through August Y, 1961, KRS also received (in addition to the receipts from its carpentry subcontracting business stated in Finding 40) $30,879.05 [9] in connection with the sale *347 of a certain house which it built on its own land on Marlborough Hoad.
42. Sometime about the middle of December 1960, subsequent to the meeting of EEB’s stockholders held earlier in that same month (mentioned in Finding 39), KEB was awarded a large contract to perform carpentry subcontracting work on a housing development project (first named “Sherwood Estates” and later changed to “Forest Ridge Homes”) which a Mr. William Pate and a Mr. Biscund were building in partnership.[10] Due to the conflicting testimony presented, there is some question about this matter, but upon consideration of such testimony as a whole, the versions presented by both plaintiff and defendant are rejected and it is found that a labor foreman employed on the above-mentioned project told Nakoff that Pate and Bis-cund were looking for a new carpentry subcontractor to replace one who was unable to keep up with the work; that Nakoff passed this information on to Simon who personally contacted Mr. Pate and advised him that he had a company (KEB) which could do rapid work and mentioned several builders for whom “they” had done work, including Alvin and “possibly” Peter Rzepka (as of this time, KEB had not performed any work for Rzepka or any other builder, except Alvin, but KRS had done so); that Pate gave the plans to Simon; that, thereafter, Zaremba figured the job, following which he and Simon returned and gave Pate a price; that after some refiguring by Zaremba and negotiation, KEB’s bid was lowered to a figure acceptable to Pate who *348 then told Simon to go ahead with the work; that Pate never met Nakoff and he did not know Simon; that while Pate had heard Zaremba’s name prior to their first meeting, he had never met him before and did not know about his business association with Simon; that after KEB was awarded this contract, Simon advised Pate that Zaremba would be in complete charge of the project and that if he (Pate) wanted anything, he should contact Zaremba; that Pate understood that Zaremba was to be the superintendent on the j ob and the latter acted in this capacity; and that although Pate did not know who was running KEB, he subsequently learned from Za-remba that the latter, Nakoff, and Simon owned stock in this corporation, and gained the impression that Simon was the major stockholder. Considering the foregoing and the entire record, it is concluded that while both Nakoff and Zaremba played important roles in obtaining the Pate and Biscund contract, Simon was the one who was largely instrumental in actually securing this account for KEB. While Simon could have submitted a bid for this work on behalf of KES, it would be unrealistic to conclude that he had any real choice but to seek the contract for KEB. Nakoff and Zarem-ba certainly would have objected to KES’s performing the work, considering the part they had played in obtaining this contract and Simon’s commitments to join with them in seeking new business for KEB.
43. (a) The evidence does not support a finding that people in the building business generally were familiar with the fact that KEB was a new company, separate and different from KES; that KEB had been set up to do the Alvin work; and that Nakoff and Zaremba had a part ownership interest in KEB. It is reasonably certain that these facts were not widely known at the time KEB was first organized and during the period both that corporation and KES were doing Alvin work throughout the first four months or so of KEB’s existence. Alvin undoubtedly knew the basic facts concerning the internal affairs of these two companies from the beginning of KEB. A very limited number of other builders, such as *349 John Conry, for whom KBS had performed work and who was well acquainted with Messrs. Nakoff, Zaremba and Simon, and Peter Bzepka, who gaye a substantial amount of work to KBS until 1961, learned of the facts in question in a general way at some indefinite time. The evidence indicates, and it is reasonable to conclude, that suppliers and equipment salesmen who had either done business with KBS prior to the formation of KEB and thereafter did business with both of these corporations, or who first had dealings with KEB, with or without previous knowledge of KBS, became aware of the fact that these two corporations were separate. It also may be inferred that builders who awarded contracts to KEB after it stopped doing Alvin work became cognizant of the fact that Nakoff and Zaremba, as well as Simon, had an ownership interest in KEB; but the evidence as a whole does not support a finding that states or implies that builders, who had previously done business with KBS and later awarded contracts to KEB, made any real distinction between these two corporations, or awarded contracts to KEB simply because of the stock interest Zaremba and Nakoff had therein, and would not have given KBS any business even if it had submitted bids for the work in competition with KEB. It is true that the builders who did business with KEB dealt with Nakoff and Zaremba, particularly after contracts for the work had been awarded to KEB, since they were in charge of field operations; but when a serious dispute or important problem arose, Simon was called in to discuss the matter, and no facts are supported by the record from which an inference might be drawn that builders were under the impression that either Nakoff or Zaremba, rather than Simon, “ran” KEB or that Simon’s interest in that corporation was of minor importance.
(b) After KEB and KBS stopped doing work for Alvin in December 1960, KBS continued doing carpentry subcontracting business, and sought and obtained some new business of this kind; however, KBS did not bid on any work that KEB obtained during the time KBS remained in exist *350 ence. It is undisputed that tlie success of KBS’s business was almost completely dependent upon Simon and that he alone was responsible for obtaining contracts for KES.[11]
(c) While the record will not support a finding that Nakoff and Zaremba actively sought new business for KES during the time they were employed by that corporation, it is concluded, considering Zaremba’s own testimony and the fact, among others, that he and Nakoff were officers of KES, and shared in bonus payments made annually by KES to its employees, that if they had heard of a lead on new work when they were working for KES, such as the “tip” Nakoff received which led to KEB’s obtaining the Pate and Biscund accounts, they would have passed this information on to Mr. Simon.
(d) The facts surrounding the Pate and Biscund contract (Finding 42), considered in light of the evidence as a whole, support the conclusion that Simon was in a position to obtain contracts for either KEB or KES; however, this finding does not imply, nor should any inference be drawn therefrom, that Simon was the only person who was in a position to obtain, or actually obtained, contracts for KEB, *351 or that he had any real choice but to obtain the Pate and Biscund contract for KEB.[12]
(e) The record shows that after KEB obtained, as a result of the joint efforts of Messrs. Nakoff, Zaremba, and Simon, the Pate and Biscund account in December 1960, it did not secure any other new business until sometime subsequent to January 1, 1961. The evidence indicates that during the period from January 1, 1961, through July 31, 1961, all of the above-named individuals sought and obtained jobs for KEB; that some contracts were secured by Nakoff and Zaremba; that some were obtained solely by the latter; and that some were secured by Mr. Simon alone. While defendant does not dispute the foregoing facts, it sharply disagrees that Nakoff and Zaremba were responsible for obtaining “substantial” new business for KEB and contends in effect that the jobs obtained by them did not represent a “substantial” amount of “new” business. A close analysis of KEB’s receipts during the above-mentioned period discloses that, excluding receipts from Alvin, KEB had receipts of $138,746.78 “from other sources” (see Finding 40(b)); that $105,703.78 of these receipts was from the Pate and Bis-cund account, leaving receipts in the amount of $33,061. During the trial a document[13] was admitted in evidence as representing testimony Mr. Simon would present with respect to the jobs KEB obtained after it lost the Alvin business in December 1960, the date of first receipts from each builder, and the person or persons purportedly responsible for ob- *352 taming the account. The first three builders appearing on this list are “Sherwood,” “W. B. Pate,” and “Forest Ridge.” KEB had receipts from the first two builders on December 22, 1960 (see Finding 42 and footnote 10), and from the third one on January 13, 1961. As previously indicated (ibid.), these builders were actually one and the same, and constitute the “Pate and Biscund” account. Despite the fact that this account was obtained through the joint efforts of Messrs. Nakoff, Zaremba and Simon (ibid.), only Nakoff and Zaremba, are shown as being “responsible” for said first three jobs listed. In view of the foregoing, the receipts from “Forest Ridge” are included in the figure of $105,703.78, mentioned above, and the above-mentioned document is considered suspect insofar as it purports to prove that Nakoff and Zaremba were the ones actually “responsible” for obtaining the jobs respectively attributed to them. The above-indicated information shown on the exhibit in question is summarized in the following table which covers the period January 1, 1961, through July 31,1961:
Builder Date of first receipt Responsible for obtaining the job Total amount received
Marla Homes_ 2/ 3/61 Nakoff and Zaremba.. $9,910
M <6 R Constr... 2/24/61 Nakoff and Zaremba.. 12,206
Valley Eorge_ 2/24/61 Simon..__ 4,800
Concrete Wall... 3/17/61 Zaremba_ 1,400
E & M Builders.. 6/27/61 Nakoff and Zaremba.. 1,685
Better_ 6/29/61 unknown_ 460
Lurain Gardens.. 7/17/61 Nakoff and Zaremba.. 2,700
Total.. 33,081
Even if plaintiff should be given the benefit of the doubt that Nakoff and Zaremba were solely responsible for obtaining the jobs indicated in the above table, it is apparent therefrom that, at the most, Nakoff and Zaremba alone were jointly responsible for total receipts of $27,801 (including $1,400 from Concrete Wall for which Zaremba alone was supposedly responsible); that four of the seven new ac *353 counts listed were obtained prior to the time KRS stopped doing subcontracting work in March or April 1961; and that there were no receipts from new business subsequent to March 17,1961, until June 27,1961. One of the first four new accounts, i.e., Valley Forge, was admittedly obtained solely by Simon. Another one of this group of accounts, i.e., Concrete Wall, was owned and operated by the Coury brothers, including John Coury who had known Simon since about 1955, as a result of Concrete Wall and KRS’s doing the foundation work and the carpentry subcontracting work, respectively, on Alvin projects over the years before and after KEB was formed. KRS also did business and engaged in joint ventures with Concrete Wall. (See Findings 41 and footnote 9 thereto and 50(a) and footnote 17 thereto.)
Contrary to plaintiff’s contention, the foregoing and other facts established by the evidence showing that new jobs obtained by KEB represented builders with whom KRS had done business are considered important. Such facts demonstrate that Nakoff and Zaremba were responsible for obtaining only a relatively small volume of new business from a limited number of builders for whom KRS had not done work.
(f) Considering the facts set forth in paragraphs (a) through (e) of the instant finding and all the evidence in the record, it is concluded that Simon was in a better position to obtain business for KEB than either Nakoff or Zaremba, and that a large part of the work which KEB performed during the time KRS remained in existence following the completion of existing Alvin work in December 1960, was primarily obtained, directly or indirectly, as a result of Simon’s efforts, contacts, and reputation in the building business, and his decision not to have KRS compete with KEB for carpentry subcontracting business. The word “substantial” is a relative term, and when the receipts ($27,801 — see (e) above) derived by KEB from new business for which Nakoff and Zaremba were allegedly solely responsible during the period January 1, 1961, through July 31, 1961, are *354 compared with those said corporation had as a result of work it performed for Alvin Builders in 1960, or when such receipts of $27,801 are compared' with those KRS had during the period it was doing business both as a proprietorship and a corporation, prior to the formation of KEB and during the period from July 1960 to December 1960, when KRS was working on existing Alvin projects, as well as doing carpentry subcontracting work for other builders, it cannot be found that “Nakoff and Zaremba were instrumental in getting substantial amounts of new business for KEB.” Such a finding would provide the basis for an inference unsupported by the evidence that the role played by Nakoff and Zaremba in getting new business for KEB was of equal, if not superior, importance to that played by Simon.
On the basis of the entire record, it is found that Messrs. Nakoff, Zaremba and Simon jointly participated in efforts which resulted in KEB’s obtaining a substantial amount of new business after KEB and KRS stopped doing Alvin work; that Mr. Simon was largely responsible for getting the jobs that were given to KEB as a result of these joint efforts; and that the amount of business that Nakoff and Zaremba alone were instrumental in getting for KEB represented a relatively small percentage of the entire work awarded to KEB, as compared with the amount of work that Simon alone obtained for KEB coupled with the jobs that were given to KEB primarily because of his participation in the negotiations therefor.
(g) While Nakoff and Zaremba were justified in insisting that new contracts which they had helped obtain go to KEB, this is not necessarily true with respect to jobs which Simon obtained alone and voluntarily turned over to KEB. While Simon was undoubtedly under a moral obligation to honor his commitments to Nakoff and Zaremba by channeling as much work as possible to KEB, the fact remains that he was the one who made the decision not to have KRS compete with KEB for carpentry subcontracting business, with the con *355 sequence that KES stopped doing this kind of work, lost the source of practically all of its receipts, and chose to liquidate for lack of sustaining business.
44. The testimony shows that by the time of the meeting of KEB’s stockholders in December 1960 (mentioned in Finding 39), the housing business in the Cleveland area had slowed down and it continued to get worse. The building market declined sharply during the winter months of 1960-1961, and business conditions became bad. According to Simon, the recession was one of the worst he had ever experienced. Eegardless of the foregoing, for reasons hereinafter set forth, the evidence will not support a finding requested by plaintiff to the effect that the substantial decrease in the volume of KES’s business, which the record clearly shows occurred during the winter months of 1960-1961, particularly after KBS stopped doing Alvin work, was primarily due to the unfavorable business conditions that existed at that time. KES’s payrolls (mentioned in Finding 37 (c)) indicate that by October 26,1960, the volume of work then being performed by KES had decreased to considerably less than one-half of what it had been doing during the week preceding the payroll period ended July 27,1960, about which time KEB started operations, and that during the months of November and December of that same year the average volume of work done by KES declined to a very low point which represented a relatively small percentage of the work done prior to the time KEB commenced doing business. KES did not bid on new Alvin work after the formation of KEB which lost this account for reasons other than poor business conditions. Futhermore, despite the unfavorable business climate that apparently existed, the evidence shows that KEB, with Simon’s assistance, was able to obtain a large contract from Pate and Biscund in December 1960 (see Finding 42 and footnote 12), and other work during the months that followed (Findings 40(b) and 43(e)); that, as indicated, *356 infra, early in 1961, Peter Rzepka started a large construction project; and that large public construction projects were undertaken on several of which KRS unsuccessfully bid (Finding 50 (a)).
As indicated above, the evidence discloses that during the early part of 1961, KRS unsuccessfully bid on a contract to perform carpentry subcontracting work for a builder named Peter Rzepka, most of whose substantial volume of work KRS had performed until that time. Findings 15 and 16(a). The amount of the bid made by KRS on this contract is not disclosed by the record but Simon testified that the job was too large for KEB to handle. In view of this fact, considering the size of the Pate and Biscund contract which KEB undertook and that KEB had a substantial cash balance at the time of the bidding on the new Rzepka project, the latter must have involved a large amount of carpentry subcontracting work. It appears that early in 1961, KRS performed work for Rzepka on existing contracts but was not awarded any new work during that year. Finding 57 (c). While undoubtedly the failure to obtain the above-mentioned work, combined with poor business conditions, contributed to the decline in KRS’s carpentry subcontracting and other business, it is concluded, considering the evidence in the record as a whole, that the principal reasons why the volume of KRS’s carpentry subcontracting business declined during December 1960 and the first few months of 1961, to the point that it had no more of this kind of work after March or April of that year, was because (1) KRS stopped doing Alvin work after it completed existing projects in December I960; and (2) Simon, who because of his excellent reputation as a carpentry subcontractor and contacts among builders in the area, was in a better position to obtain new business than the other principals of KEB, joined with them and rendered major assistance in obtaining new business for that corporation rather than for KRS; and (3) Simon had KRS engage *357 in unproductive business activities involving general contracting and large public construction in which fields KES lacked experience and a reputation because it had not previously engaged in such operations to any substantial degree.
45. (a) Defendant disputes plaintiff’s contention that KES made bids upon and received substantial new subcontracting business during the winter of 1960-1961, and belittles the amount of new business of this kind that KES obtained during the time it remained in existence after KEB started operations in July 1960. In connection with its reply to the foregoing, plaintiff contends, among other things, that “in terms of receipts,” KES did “new business” after it was decided to form KEB of more than $99,000, which assertedly includes: (1) receipts representing new carpentry subcontracting business of $9,985, $18,570, and $39,685, from Fred Ezepka, Elyria (Barton Eoad), and Homestead and New Haven, respectively, totaling $68,240; and (2) receipts from the sale of the property at 7404 Marlborough Eoad of $26,-770 and from Concrete Wall of $4,127.[14] The evidence shows that KES had receipts from Homestead long before KEB was formed, and while it did not have receipts from New Haven until October 1960, both of these companies were operated in partnership by Messrs. Groynom and Simon (Findings 15 and 16(a)); therefore the evidence does not support plaintiff’s contention that KES’s receipts from Homestead and New Haven reflect new carpentry subcontracting business, and the above figure of $68,240 is reduced to $28,555. The only major new carpentry subcontracting-job KES obtained during 1960 after the formation of KEB was from Elyria (Barton) mentioned above. As indicated heretofore (Finding 40(d)), KES’s receipts from subcontracting, other than Alvin business, after January 1, 1961, totaled $26,973.36. Of this amount, $16,445 was from com *358 panies owned and operated by Peter Kzepka for whom KES bad performed substantial work over an extended period of time, wbicb receipts apparently represented work performed during 1960 and/or 1961 on a contract obtained prior to January 1,1961 (see, e.g., Findings 15 and 16), and $40 was from a company in wbicb an interest was beld by George Groynom with whom KES had previously done considerable business (ibid.).
After January 1961, KES obtained new, carpentry subcontracting business, wbicb resulted in a receipt of $503.36 from a source identified as “Kubinski,” and receipts of $9,985 from “Investa (or Investía) Homes and E & E Homes,”[15] making a total of $10,488.36.[16]
(b) Considering the foregoing and the entire record, it is clear that KES obtained and performed relatively little new carpentry subcontracting business after it completed work on Alvin projects in December 1960, and when KES’s receipts of less than $11,000 are compared with the receipts it bad previously, it cannot be found that KES received substantial new carpentry subcontracting business in the winter of 1960-1961.
(c) Plaintiff makes a point of the fact that subsequent to completing the Alvin work, KES continued its existing subcontracting business until March or April 1961, and bid on *359 a substantial amount of new business of this kind during the winter of 1960-1961, and that, considering poor business conditions, KES should not have been expected to be successful on “every” bid. The difficulty with plaintiff’s position is that the record discloses that except for one job upon which KES submitted an unsuccessful bid, i.e., a Peter Ezepka project (Finding 44), and the small contracts it bid and obtained from Investa Homes, E & E Homes, and Kubinsld, most, if not all, of the other bids made by KES in 1961 were submitted by it and another contractor in joint ventures as general contractors on several large construction projects, none of which bids were successful; and that, aside from the exceptions noted above, KES apparently made little effort to obtain the kind of work which had constituted its principal business activity until early 1961.
46. During the year 1961, KES (1) sought additional general contracting work; (2) entered into a joint venture as a general contractor building (on land located on Marlborough Street, mentioned in Finding 41 and footnote 9, which was apparently purchased and subdivided by KES sometime in 1960) two homes with another contractor (Concrete Wall), only one of which was sold prior to the dissolution of KES; and (3) in the first few months of 1961, made bids on several large public construction projects as a joint venturer with another general contractor, none of which bids were accepted. The evidence discloses that KES’s receipts during the year 1961, as a result of the aforementioned actvities, consisted of $27,000 derived from the sale of one double house and $4,127.07 from Concrete Wall, or a total of $31,127.07 (which receipts relate to the two homes KES and Concrete Wall built on Marlborough Street as joint venturers). See Finding 41 and footnote 9.
47. The profit and loss statements of KES for the years ended May 31,1959, May 31,1960, and May 31,1961 (the first three full years of its operation), as reported on its federal income tax returns, were as follows:

*360

*361

*362

*363 48. KES paid dividends as follows:
Year ended:
5/31/58 0
5/31/59 ?500.00
5/31/60 3,000. 00
5/31/61 12,750. 00
The dividends in the year ended May 31, 1960, were paid at the rate of sis dollars per share. The dividends in the year ended May 31, 1961, were paid at the rate of $50 per share on its Class B common stock and one dollar per share on its Class A common stock.
49. The balance sheets of KES as of May 31,1958, May 31, 1959, May 31, 1960, and May 31, 1961, as reported on its federal income tax returns, were as follows:

*364

*365

*366 50. (a) During the period from January to June 1961, KES (in addition to submitting a bid of $9,480 on an apartment job by itself) bid on four or five large public construction projects as a general contractor in joint ventures with other general contractors.[17] The bids ranged from $132,-128 to $393,761 and were made as joint ventures because KES was not large enough to bid the jobs alone. A bid bond, which automatically refers to a performance bond, is usually required of jobs of such magnitude. In order to obtain such bonds, KES and its joint venturer had to submit a list of assets. On the basis of conflicting testimony presented by Simon and John Coury, it is found (contrary to plaintiff’s contention that KES “needed a net worth of at least equal to the amount of the bid”) that normally a bonding company requires a bidder to have cash in an amount equal to at least ten percent of the bid and net worth in varying amounts, largely determinable on the basis of the bidder’s experience. It is clear that as of the time these bids were made, KES did not have any experience in doing work on large public construction projects and had not done sufficient general contracting to establish any real reputation in this field. There is no evidence clearly showing the reputation and experience of the companies operated by the Coury brothers or any other general contractor who submitted bids with KES as a joint venturer. Under such circumstances, any finding as to KES’s net worth needs in making these bids with another contractor would be purely speculative. However, it may be reasonably assumed that because of KES’s lack of experience and reputation, it could not have qualified for required bonds and bid these projects alone without having substantial assets, including cash.[18]
*367 (b) According to testimony presented by Simon, one of KBS’s employees was “hired”[19] to assemble information and prepare estimates, after which John and Tom Coury and Simon decided upon the final bid price and sent in the bid; however, in one instance the job was figured in the offices of Concrete Wall, the final bid figures determined by the Oourys after they had gone over the estimates prepared by one of KBS’s employees, and the bid sent in by Concrete Wall without KBS’s name being included thereon.[20] It took from two to four weeks’ time for each bid, depending upon how fast a particular bid had to be submitted. In the first half of 1961, Simon divided his time about equally between KEB and KBS, except during periods KBS was making commercial bids, when 60 to 70 percent of his time was spent on its affairs.
51. KBS did not carry liability insurance; but the record does not support a finding that its exposure was between $300,000 and $400,000. Such contention is based upon testimony presented by Simon, which is rejected as incredible, unrealistic, speculative, and contrary to the evidence, to the effect that KBS’s exposure was coextensive with the amount of the bid made on its largest job. This was a $392,000 public construction project which KBS bid as a joint venturer with another contractor who presumably was subject to a share of any potential exposure resulting from these bids. Furthermore, the evidence shows that the joint venturers planned to engage subcontractors who, it may be reasonably assumed, would have been required to furnish bonds or guarantees, thus limiting the exposure of KBS and its joint venturer.
*368 52. Plaintiff’s contention that during the spring of 1961, ICRS “was incurring large overhead expenses, as high as $4,000 a week, in connection with its business,” is rejected as unsupported by acceptable testimony or other evidence. Mr. Simon testified that KRS had high overhead which included salaries of key employees who were retained in order for the corporation to be in a position to obtain business in the future, salaries of employees who were kept on the payroll to help bid these commercial jobs, and taxes. Mr. Robertson, KRS’s accountant, testified, without reference to books and records, that KRS’s overhead was running approximately $4,000 per week during 1961. Undoubtedly, KRS incurred some direct and continuing overhead expenses attributable to attempts to maintain its position as a going concern and to obtain large public construction contracts. But there is no corroborating testimony or other evidence in the record showing the exact amount of KRS’s overhead during specific periods in the spring of 1961; nor is there any evidence as to the amount of KRS’s payroll and other expenses incurred in connection with, or reasonably related to, the corporation’s business activities involving commercial bidding.
53. (a) It is found that during 1960 KRS’s accounts receivable ranged from $80,000 to $170,000 and its miscellaneous operating expenses, exclusive of payrolls and taxes, amounted to an average of approximately $2,000 per month during the years 1960 and 1961. But it cannot be found on this record (for several reasons, some of which are briefly mentioned hereinafter) : (1) that KRS needed approximately $300,000 in cash in its business; (2) that its subcontracting payrolls were running about $125,000 per month (with the implication that this was true throughout the year ended May 31,1961); or (3) that KRS’s liability on its one-year guarantee was about $25,000 a year.
(b) Plaintiff’s contention indicated in (1) above is based primarily on testimony presented by Simon which is rejected as an exaggeration of KRS’s cash needs, contradictory to other testimony presented by him, and contrary to the evidence. Undoubtedly, KRS had capital needs, including a substantial amount of cash, to meet payrolls, bonding *369 requirements and anticipated expenses relating to work on large public construction projects upon which it was bidding; but it should be kept in mind, among other things, that KRS’s carpentry subcontracting business started to decline early in the fall of 1960, sharply decreased later on in the fall of that year and in the winter of 1960 and 1961, .and stopped entirely in March or April of 1961; that it actually did a minimal amount of general contracting during its entire existence and it is clear that little of this kind of business was done or sought after KEB was formed until early in 1961; that while KRS engaged in considerable, albeit unsuccessful, business activities in the general contracting field during the first few months of 1961, all of its bids were made as a joint venturer with another general contractor who, it may be reasonably assumed, possessed some cash and other assets which a bonding company took into consideration in determining whether the bidders had sufficient assets to qualify for a bond.
(c) As to plaintiff’s contention indicated in (2) above, KRS’s weekly payroll records (plaintiff’s Exhibit 5) covering the period January 1960 through July 1960, disclose that its monthly payrolls averaged $98,586.16, ranging from a low of $49,896.24 to a high of $122,198.07. During the period August 1960 (shortly after KEB was formed and started doing business) through December 1960, KRS’s average monthly payroll dropped to $58,634.97, ranging from a low of $12,778.47 to a high of $87,910.66. During the period January 1961 through June 1961[21] the monthly average payroll sharply declined to $7,994.90, ranging from a low of $4,167.74 to a high of $18,256.69 (in the month of March which was due to a $15,418.20 payroll for the week ending March 15,1961). (See Finding 40(c) for additional facts relating to this subject matter.) It is clear from the foregoing and the record that plaintiff’s contention (either direct or implied) with respect to KRS’s payrolls subsequent to the time KEB was formed, particularly during the fall of 1960 and 1961, is grossly exaggerated.
*370 (d) With respect to plaintiff’s contention indicated in (3) above, it should be explained that the record shows that expense for guarantees was accounted for as part of the regular payroll. In other words, KRS’s capital needs were not increased by reason of this item over and above the cash required for payrolls.
54. (a) On July 31,1961, KES had the following property of the book value indicated:

Property Boole Value (on July 81,1961)

Gash _ $138, 095.18
Total debentures- 80,000. 00
Deposit — Lincoln Savings & Loan Company- 10, 000.00
Deposit — Workmen's compensation_ 7, 800.00
Eeal estate_ 43, 636.48
Forest City stock_ 500. 00
Equipment and tools_ 1,376. 73
Truck and wagon_ 3,690. 09
Office equipment_ 371. 03
Total_ [22] 285,469. 51
With respect to KRS’s above-listed property,[23] Simon testified to the effect that the “Cash” was required to meet payrolls ; that the “Debentures” were used “in looking forward to paying our taxes”; that the “Workmen’s compensation deposit” was made to comply with Ohio law; that the “Eeal estate” was used in building homes on speculation, thereby keeping KES’s crews busy in slack periods; that the “Forest City stock” was used “generally as a means of seeing how all of our large suppliers were doing”; and that the “Equipment and tools” represented generators, air compressors, and power nailers that were a necessity on the job. Simon also testified that KES needed all of this property in order to obtain necessary bid and performance bonds because the bonding company required the corporation to list its assets.
*371 It cannot be seriously questioned that some of the money and other property in question were required and used in connection with KES’s carpentry subcontracting business and/or its general contracting operations, bidding on public contracts, and other business activities, sometime during the year ended May 31,1961. Certainly, it is reasonably clear that KES required (1) a certain amount of cash to meet its payrolls, purchase supplies and materials, pay overhead costs and miscellaneous expenses, (2) a workmen’s compensation deposit, (3) the operating equipment and tools, (4) the truck and wagon, and (5) assets, including cash, in order to qualify for bid and performance bonds in connection with its efforts to obtain public construction contracts, and to be in a position to carry out any contracts that might have been awarded to the corporation. But plaintiff has failed to adduce satisfactory proof, particularly, that it required and used (1) cash in the amount of $138,095.18, (2) $80,000 in debentures (either in connection with anticipated tax payments or other purposes), (3) the deposit in the Lincoln Savings and Loan Company, (4) real estate valued at $43,636.48, and (5) Forest City stock valued at $500; nor has plaintiff proved that all of these particular assets of the values indicated were “essential” or “necessary” to the conduct of KES’s business operations as they were actually carried on. In summary, plaintiff’s broad and sweeping contention that during the part of the year ended May 31,1961, subsequent to the formation of KEB, KES “required” and “used” in its business all of the cash and other specific items of property and assets which it had on hand as of July 31, 1961, must be rejected as not being supported by the evidence.
(b) Plaintiff contends that in addition to the above-listed property, KES “used electric tools, which were essential in its business, of the approximate worth of $8,000.” It appears that these tools included and mainly consisted of a number of Skil saws which KES handled on its books as an expense item. Most, if not all, of these tools are the same as those which Simon received from KES at the time it was liquidated. (See footnote 27.) No valuation of these tools was made during the time it was in existence or when it was being *372 dissolved.[24] The tools were not included in the distribution made by KRS to Simon and its other shareholders. (See footnote 30.) Simon did not mention these tools in connection with a claim for refund he filed subsequent to the time KRS was liquidated, which asserted that the value of certain assets distributed was less than reported. In 1963 Simon traded in 11 of these tools to a tool supplier for $247.50, which amount was erroneously credited to KEB’s account for some similar tools which it has purchased. Apparently this credit was made to KEB because the company making the credit did not have an open account with KRS and had no other such account to which it could apply the credit. When the error came to the attention of Simon, he disregarded the matter as it resulted in a very small actual loss to him because of his substantial ownership in KEB.
The $8,000 valuation placed on these tools is rejected as a speculative figure, unsupported by competent testimony or evidence. Considering the evidence as a whole, it cannot be found that the tools constituted substantial business assets of KRS, or were regarded and treated as such by the corporation or by Simon.
55. Plaintiff contends that the earnings of KRS were needed in its business and were not accumulated beyond the business’s reasonable needs,[25] and that KRS needed all of its capital to continue its subcontracting work, to build on its own land, and to bid upon and carry out large public contracts. Considering the evidence in the record as a whole, it *373 is reasonably clear that all of KES’s earnings were not used or needed to continue its carpentry subcontracting business, particularly the manner in which it was carried on after December 1960, nor to build on its own land to the extent this was done. It is also clear that KES did not actually require and use all of its earnings in connection with its efforts to expand operations in the general contracting field and to obtain public contracts. KES undoubtedly had to have a substantial amount of cash and other capital assets in order to maintain itself as a going concern, to look for jobs, to negotiate with subcontractors and prepare estimates preliminary to submitting bids on large construction projects, to be in a position to obtain required bid and performance bonds, and to carry out large public contracts had its bids for such work been accepted. However, it cannot be found on this record that KES needed all of its capital to continue its overall business operations and activities during the year ended May 31,1961.
56. When KEB was organized, the liquidation of KES was not contemplated or planned, and there was no reason to believe that it might eventually be liquidated. According to Simon, he had never considered liquidating KES until June 1961, because it “was making money before that time.” This testimony is contrary to the evidence and inconsistent with other testimony presented by Simon that KES was liquidated because it had “high overhead,” was “losing money,” and was not being awarded contracts on the large commercial jobs upon which it had bid. It is clear that these conditions existed before June 1961, because the record shows that while KES had some receipts during that year, it was not making money from new work for some time prior to June 1, 1961; that it stopped doing carpentry subcontracting work sometime in March or April 1961; that thereafter it incurred payroll and overhead expenses without doing any more work of this kind; and that it submitted all but one of its unsuccessful commercial bids prior to June 1, 1961. Simon’s testimony is rejected as a transparent effort to convince the court that the decision to liquidate was not considered until after KES declared its last dividend on May 31,1961.
*374 57. (a) It appears that Simon first discussed, the matter of liquidating KRS with, his attorney in June 1961. According to plaintiff, the decision to liquidate KES was reluctantly made in the month of June after thorough discussion of the alternatives, and because of the bad economic outlook in the building field (see Finding 58), the loss of a major account (ibid.), the large losses that were accruing to it, and the fact that it was not being awarded contracts on the large commercial jobs upon which it had bid.
(b) Messrs. Simon and Robertson presented testimony to the effect that neither tax considerations nor possible tax savings were among the motivating factors which led to the decision to liquidate KES. There is no direct evidence contrary to such testimony.
(c) Plaintiff’s contention that the only possible alternative to the liquidation of KES in June 1961 was to continue to operate it at a loss is rejected. It is clear from Simon’s own testimony and other evidence that either KES or KEB could have been liquidated during the summer of 1961, and that Simon was the person primarily responsible for making the decision to liquidate KES. If Simon had decided to liquidate KEB, there appears to be no reason why KRS could not have continued in the carpentry subcontracting business as did KEB. It is possible that if a decision had been made to liquidate KEB, Messrs. Nakoff and Zaremba may have declined to work for KES. Understandably, Simon did not want to lose these men and felt committed to keep KEB in business. But KES’s future was at stake and he could have made the hard choice and decided to maintain KES as a going concern, rather than KEB.
58. (a) On July 31,1961, the Board of Directors of KES, consisting of Mr. and Mrs. Simon and Mr. Robertson, adopted a resolution which included the adoption of a “Plan to Complete Liquidation” and directed the directors to proceed “to a complete winding up of its affairs” and then “distribute all of its assets and property to the holders” of its outstanding shares “in complete liquidation and cancellation and redemption of all its outstanding shares.” The resolution recited, among other things, a statement to the *375 effect that KRS had experienced a substantial decline in its business during the past year because of the state of the economy and the loss of a major account, and that it had, among other things, made numerous bids on public contracts in order to reverse the decline in its business but that such bids had not been accepted.
(b) There is no evidence to support a finding that the economic outlook in the building field was bad in the summer of 1961, nor that the state of the economy and the loss of a major account were the primary reasons that caused KRS to experience a substantial decline in its business during the preceding year. See Finding 57(a). While the aforestated reasons may have been among the contributing factors which led to the decision to liquidate KRS, it is f ound that the principal reasons why KRS’s business declined were because (1) Simon decided to form KEB for the purpose of performing new Alvin work with the result that KRS stopped doing such work and did no business with Alvin after completing existing projects in December 1960; (2) KRS did not compete with KEB after December 1960 for the kind of carpentry subcontracting business which had previously been the primary source of its receipts; (3) Simon devoted most of his efforts in the carpentry subcontracting field to obtaining contracts for KEB rather than KRS; (4) KRS stopped doing this kind of work altogether in March or April 1961; and (5) KRS limited its business activities to unsuccessful attempts to obtain large public construction contracts.
Prior to 1961, KRS engaged in general contracting work to a very minor degree and did not make bids on large public construction projects; so it cannot be said that KRS experienced a substantial decline in these fields of business.
(c) The “major account” referred to in the resolution mentioned in (a) above was the Peter Rzepka account. As indicated hereinbefore (see Finding 15), prior to early 1961, KRS had done carpentry subcontracting work for various companies owned and operated by Peter Rzepka. The evidence indicates that Rzepka, like most builders, invited bids from carpentry subcontractors other than KRS, and awarded *376 a contract to tlie lowest bidder. Accordingly, it may be assumed that KES obtained a contract from Ezepka only when it submitted the low bid and did not do all of Ezepka’s work. This conclusion is supported by the fact that in the first part of 1961, KES unsuccessfully bid on a contract to perform carpentry subcontracting work on a Ezepka project which was too large for KEB to handle and the work was performed by another subcontractor. It is clear from the foregoing that KES did not lose the Ezepka account because it never had Ezepka’s business exclusively to lose — it simply lost a contract to a lower bidder.
In connection with the foregoing, evidence shows that after it was decided to liquidate KES but before this was done, KEB submitted a bid to perform carpentry subcontracting work for Ezepka and was successful in obtaining a contract to do this work. On August 11, 1961, KEB received the first of a number of payments on this contract and its receipts from Peter Ezepka companies during August and September 1961 totaled $109,327. Plaintiff’s contention that this contract was obtained through the efforts of Zaremba is rejected because of its implication that Simon did not play a part in getting this work. No doubt Zaremba estimated this job because he did the estimating for KEB. He also may have lowered the bid to get the contract.[26] But it should be noted that KES did not make a bid on this contract; that by this time Simon was promoting KEB’s business exclusively; that he held 80 percent of KEB’s stock; and that KES had previously done substantial business with Ezepka as a result of Simon’s operation of that corporation. Under these circum *377 stances, it cannot be found that due to Zaremba’s efforts, KEB obtained an “account” which KRS had “lost.”
59. Sometime during the summer of 1961, after it had been decided to liquidate KRS but before this had been done, KRS’s accountant, Mr. Robertson, received a call from an Internal Revenue Service agent who advised he desired to make an examination of KRS. Robertson advised this agent that it had been decided to liquidate KRS and suggested the audit be deferred until after the liquidation had been completed. This was agreeable to the agent and the audit was not made until sometime in September 1961.
60. It appears from payroll records and other evidence that KRS stopped doing business sometime prior to July 31, 1961, when its Board of Directors adopted the resolution (mentioned in Finding 58(a)) calling for the liquidation of the corporation. Thereafter, on August 14, 1961, KRS was liquidated in accordance with Ohio law.
61. (a) On August 14 and November 14,1961, all of KRS’s assets and properties were distributed to its shareholders, including plaintiff, in exchange for their stock. Thereafter, the shareholders reported on income tax returns filed by them the following distribution of KRS’s assets which they had received in exchange for their shares of KRS’s stock:[27]

*378

*379 (b) It will ba noted from tbe above table that plaintiff and tbe two other trusts involved herein received cash only, whereas Mr. Simon received both cash and other property. The “Equipment” distributed to Mr. Simon included, among other things, a generator and a few other unidentified items (possibly some compressors) which he sold to unknown individuals for undisclosed prices. There is no evidence showing that the items sold were a substantial part of KRS’s operating assets. The items of “Equipment,” with the exceptions noted, “Automobile and Truck,” and “Office Equipment,” distributed to Mr. Simon on August 14, 1961, were thereafter rented to KEB for the remainder of the calendar year 1961, and the years 1962 and 1963.[28] (The lesser cost basis of the assets as shown in Mr. Simon’s 1962 and 1963 income tax returns appears to be attributable to a revaluation of certain assets distributed to him.) The “Equipment” distributed to Mr. Simon consisted of the same items of equipment KRS had on hand as of May 31, 1960 (see Finding 13), plus an item it purchased during the fiscal year July 1, 1960, through May 31, 1961. The “Automobile and Truck” consisted of two of the four vehicles owned by KRS on May 31, 1960, ibid., the other two having been sold to KEB on October 31, 1960 (Finding 28). The “Office Equipment” distributed to Mr. Simon consisted of the same office equipment KRS owned on May 31,1960 (Finding 13). Thus, as of August 14, 1961, KEB had purchased or was renting from Mr. Simon all of the fixed depreciable assets (described in Finding 13) owned by KRS on May 31, 1960, except the generator and other small items mentioned above. (As noted in Finding 54(b) and footnote 24, certain electric power *380 tools received by Mr. Simon were not considered or treated as depreciable assets.)
(c) Although, as appears from (b) above, following the liquidation of KBS, certain of its assets were rented to KEB, none of KBS’s assets were sold or transferred to KEB.
62. No KEB stock was issued or exchanged in connection with the liquidation of KBS. Plaintiff and the other two trusts which owned stock in KBS did not acquire a direct interest in KEB.[29]
63. Considering the evidence as a whole, it is concluded that:
(a) The organization of KEB was not done pursuant to any plan which contemplated the liquidation of KBS.
(b) The plan to liquidate KBS was formulated not earlier than June, 1961, at which time the organization and existence of KEB was a fait aecorrifli.
(c) While the carpentry subcontracting business of KBS was substantially transferred from KBS to KEB before the liquidation was projected, no business was transferred from KBS to KEB at the time of or in connection with the liquidation.
64. Plaintiff duly and timely filed a federal income tax return for the year 1961, and paid the tax shown thereon to be due. In its return for said year, plaintiff reported and paid income tax on the gain which it realized from the distribution of its share of all KBS’s assets and properties in exchange for plaintiff’s stock, when KBS was completely liquidated in 1961, under and in accordance with Ohio law. Plaintiff reported such gain as capital gain on the ground that the provisions of Section 331 of the Internal Bevenue Code of 1954 were, in its view, applicable to the distribution. The other stockholders, i.e., Mr. Simon and the other two trusts, claimed similar treatment in their returns for the year 1961.
65. Upon audit of plaintiff’s return for the year 1961, the Internal Bevenue Service determined that the amounts distributed by KBS to plaintiff in 1961 were essentially equiv *381 alent to a dividend under the provisions of Sections 301, 302 (c) (2) (B) (i), and 318(a) of the Internal Revenue Code of 1954, and that plaintiff therefore realized ordinary income to the extent of the earnings of KRS, rather than capital gain, from the liquidation of KRS. Based on this determination, the Internal Revenue Service proposed a deficiency in plaintiff’s federal income tax for 1961, in the amount of $6,180.50, plus interest of $504.13. Plaintiff paid this deficiency and filed a proper claim for refund in the amount of $1,322.94. The claim was disallowed and thereafter plaintiff timely filed the present action in this court.
66. The following table shows the taxable income as reported and the income taxes actually paid by KRS during the period of its existence:
Year (Fiscal Year Ending May 31) Taxable Income Income Taxes
1958. $34,010.63 $12,185.53
1959. 177,550.30 86,826.16
1960. 139, 622.95 67,089.74
1961. 117,466.67 55,434.67
1961. 4,595.42 1,378.63
473,245.97 222,914.63
67. During the period of about a year in 1960-1961, when KRS and KEB were both in existence, neither company did carpentry subcontracting work for the same builder, except Alvin (as explained hereinbefore). In 1959, KRS had receipts of $1,141 from “Coury” and $36 from Concrete Wall, one of the building companies operated by John Coury in cooperation with several brothers (see Finding 43(b)); but neither KRS nor KEB had receipts from these sources in 1960. In 1961, KEB did carpentry subcontracting work for Concrete Wall. Ibid. KRS’s business with Concrete Wall in 1961 was limited to engaging in joint ventures involving the building of two double homes on speculation and unsuccessfully bidding on several large public construction projects (which activities have been explained in detail in several findings, supra), and to loaning men to Concrete Wall on one occasion to help build a house for the personal use of *382 one of the Coury brothers for which KES was paid by the hour. KEB only performed carpentry subcontracting work and did not participate in joint ventures, engage in general contracting, perform or seek commercial building work, own or build on its own land, or bid on large construction projects, as KES had done to the extent shown in a number of findings, supra.
68. (a) After the liquidation of KES, KEB continued in the carpentry subcontracting business as it had in the past. All of KES’s employees who were on its last payroll (July 12, 1961) went to work for KEB the following week. KEB, as KES had done, maintained a more or less regular crew of key employees, many of whom were the same persons who had worked for KES. Of the 28 employees on KEB’s July 19, 1961 payroll (exclusive of Mr. and Mrs. Simon and Eobert-son), 27 of them had formerly been employed by KES and 26 were employed by KES going back as far as 1959. Of the nine men who had been key foremen of KES, eight appear on the KEB payroll of July 19, 1961.
(b) After the liquidation of KES, Simon devoted his full working time to KEB’s business.
(c) KEB’s office continued to remain in Simon’s house located on Doxmere Drive until sometime in 1962, when he moved and the office was moved.
(d) The only fixed assets shown on KEB’s balance sheets as of October 31, 1961, and October 31, 1962, were the two vehicles which it had purchased from KES on October 31, 1960 (Finding 28), and the saw it purchased for $169 in October 1960 (ibid.).
69. (a) Plaintiff makes several contentions which, in essence, have a common underlying theme to the effect that no business was “shifted” or “transferred” from KES to KEB, either at the time the latter was organized or when KES was liquidated; that during the two-year period prior to its liquidation, KES did business with 18 or so “major” accounts, only one or two of which became accounts of KEB’s after the liquidation of KES; and that none of the business being conducted by KES prior to its liquidation was continued by *383 KEB after it was decided to liquidate KRS. While these contentions are partially supported by the record in a technical sense, they are rejected for reasons apparent from the findings, infra, which show that plaintiff’s assertions of fact are misleading and give rise to inferences unjustified by the evidence considered as a whole.
(b) After the liquidation of KRS, KEB received contracts for carpentry subcontracting work from a number of builders, including, among others, several companies owned by Peter Rzepka and operated either by him or his brother, Fred Rzepka; a company named Georgetown Homes owned solely by George Groynom; and companies owned and operated by the Coury brothers, all of which builders had previously done business with KRS either alone or in association with other builders.[30]
(c) An analysis of KEB’s receipts for the year following the liquidation of KRS, i.e., August 1961-July 1962, discloses that such receipts were from the following sources in the amounts indicated:
Peter Rzepka companies_$298,090. 51
Peter Rzepka companies operated by Fred Rzepka_ 10,207. 39
George Groynom company_ 7,385. 50
Coury brothers’ companies_ 8,292. 93
Other companies_ 71,581.73
Total_$395,558. 06
(A redeposit of $450 on January 24,1962, and a receipt from the treasurer of the State of Ohio are not included in the above table.)
(d)The evidence fully supports defendant’s contention that over 80 percent of KEB’s business in the first two years of its operations was with former KRS customers.
*384 (e) Plaintiff objects at length to the facts set forth in paragraphs (b), (c), and (d), above, on the principal grounds, among others, that they fail to disclose that (1) the contracts awarded to KEB were obtained through the joint efforts of Messrs. Simon, Zaremba and Nakoff; (2) the contracts were generally awarded on a competitive basis to the lowest bidder; and (3) KRS had not previously done business with any company owned by George Groynom alone. Plaintiff also objects to defendant’s contention that when KRS was terminated, KEB took over and did a major part of Peter Rzepka’s business. Since the plaintiff’s contentions in paragraph (a) of the instant finding and its objections outlined above are interrelated and complementary, they can best be considered together, though not in the exact order advanced.
Plaintiff argues that the Peter Rzepka business, comprising over 75 percent of the 80 percent figure mentioned in paragraph (d) above, was “lost” by KRS to a competitive bidder early in 1961, and was obtained for KEB for the first time “by Zaremba” after he lowered the bid, “over Mr. Simon’s objections,” while KRS was in liquidation, and thus it was impossible for KRS to turn over the Rzepka account to KEB. As to the Groynom business, plaintiff argues to the effect that in October 1961 KEB, on the basis of new bids, did work for Georgetown Homes, which was a new company owned by George Groynom alone, whereas KRS had previously done business with two different companies owned by Groynom and his partner, A1 Simon. By reason of the foregoing facts, plaintiff concludes that as to over 77 percent of the figure of 80 percent of KEB’s business done with companies having ownership similar in part to those in which KRS had done business, there was a “sharp break.”
Plaintiff’s aforementioned contentions, objections, and arguments are rejected as being unsupported by the evidence, invalid, and specious for the reasons indicated hereinafter.
First of all, it should be noted that while the Alvin business was not, in literal terms, “shifted” or “transferred” to KEB by KRS, and KEB obtained Alvin contracts on new bids *385 which, produced receipts totaling $628,676.54,[31] it is obvious that KEB was awarded this work as a result of Mr. Simon’s decision to form KEB for the sole purpose of allowing it rather than KES to bid this work and that in practical effect, KES “turned over” the Alvin work to KEB.
Next, it appears from the evidence that Peter Ezepka, George Groynom, and John Coury became more or less acquainted with Zaremba and Nakoff while they were employed by KES; that some of these builders liked the idea of doing business with KEB because of the ownership interest Zaremba and Nakoff had therein; and that Coury specified Nakoff to work on his projects. However, Ezepka did a substantial amount of business with KES long before KEB was formed and he testified that he dealt primarily with Simon and that when KES terminated, KEB “took over.” George Groynom testified to the effect that he contacted KEB with respect to the work it did for him in 1961 and 1962, because KES had done good work for him previously, and that “we just carried along as we did before.” John Coury and his brothers, who operated Concrete Wall and other companies, had previously done business with KES, and engaged in joint ventures with it involving general contracting work and bidding large construction projects. Considering the close association of all these three builders with Mr. Simon both before and after the formation of KEB (as indicated in the findings listed in footnote 31), it is reasonable to assume that they would have awarded contracts to KES if it, rather than KEB, had submitted low bids on their jobs. In other words, KES defaulted in favor of KEB.
The evidence also indicates that KEB was awarded contracts by the above-named and other builders on the basis of new bids. But it must be kept in mind that builders did not have a real choice as between KEB and KES because the latter did not bid on work sought by KEB and that KES was liquidated. Considering the large amount of work that KES performed for certain builders over an extended period of time, it may be reasonably assumed that KES sometimes *386 followed the undisputed practice indulged in by KEB of “shaving” prices in order to obtain jobs; therefore these contracts were not always really awarded to either KES or KEB on the basis of truly competitive bids. While Zaremba did the estimating for KEB, it is unbelievable that Simon, as the principal stockholder of both KES and KEB, did not approve all bids before they were originally submitted and subsequently lowered, so it cannot be found that Zaremba obtained the Peter Ezepka business,[32] or any other contracts, simply because he estimated the jobs as part of his assigned responsibilities.
Undoubtedly, Zaremba and Nakoff were naturally interested in securing new busines for KEB, but there is absolutely no evidence in the record that either one of them sought or obtained any specific contract for KEB after KES was liquidated. Nor is there any evidence that any particular job was awarded to KEB after KES’s liquidation through the “joint efforts of Messrs. Simon, Zaremba and Nakoff,” within the meaning plaintiff apparently intends to convey by use of that term.
Paragraph (c) of the instant finding discloses that during the first year after KES’s liquidation, a substantial amount of KEB’s total receipts was from builders who had known Simon for a long time and done business with KES. Since it is undisputed that after KES was liquidated, Simon devoted his full time to KEB, and he was well known to the building-business, it is not unreasonable to assume that the receipts of $71,581.73 KEB had from “other companies” (paragraph (c) above) during this period were in large measure due to his identification with KEB and efforts on behalf of the corporation. Aside from the foregoing, it is apparent from the record that the main source of KEB’s receipts during the first two years of its existence was from builders who had *387 previously done business with KRS and/or knew Simon either personally or by reputation. While a problem of semantics is involved, when the evidence is considered as a whole, it would be unrealistic and misleading to find that KRS did not “shift,” “transfer,” or “turn over” any carpentry subcontracting business to KEB.
(f) In summary, on the basis of the foregoing and the entire record, it is concluded and found that after the liquidation of KRS, KEB continued a carpentry subcontracting business which was substantially the same as the one that constituted KRS’s principal business activity prior to the formation of KEB.
70. (a) As of October 31, 1960, KEB had a cash balance of $113,582.58. While it appears that KEB’s cash balance decreased substantially after said date, the record will not support a finding (as contended by plaintiff) that it dwindled from $140,000 in November 1960, to $40,000 in July 1961, to $8,300 in October 1965.[33]
As indicated in Finding 28, KEB operated at a profit in its first short fiscal year ending October 31, 1960. Thereafter it operated at a loss for the next two years, and made a profit during the third year. The following table shows KEB’s taxable income (or loss) for each of the years indicated.
Fiscal Years ending October 31: Taxable Income (or Loss)
1960 (7/21/60-10/31/60) - $80, 943. 21
1961_ . (24,391.21)
1962 _1_ . (13,339.56)
1963 _ _ 11,636.89
Net Profit before Taxes_[34] 54, 849. 33
*388 (b) The following table shows the compensation received by the officers of KEB for the periods indicated:
Name of Officer Fiscal Year Ending October 31 Wages
Kenneth R. Simon.. 1960 (7/21/60-10/31/60). $1,200
1961„.. 7,800
1962__---10,636
1963... 10,630
Edward Zaremfoa. 1960 (7/21/60-10/31/60)_ 2.910
1961_ 10,920
1962.... 10,726
1963 (resigned in May 1963)-. 5.910
William 0. Robertson.. 1960 (7/21/60-10/31/60)_ 280
1961__ 2,080
1962..... 1,986
1963___ 1,820
William NalrofL. 1960 (7/21/60-10/31/60)_ 2,600
1961__ 10,400
1962._ 10,448
1963_ 10,630
Arlino (Mrs. Kenneth R.) Simon.. 1960 (7/21/60-10/31/60)_ 70
1961.___ 1,690
1962 — .... 680
1963.. 1,300
It is apparent from the foregoing that although KEB showed an operating loss of $24,391.21 in 1961, and a loss of $13,339.56 in 1962, the officers of the corporation were paid wages during those years totaling $32,890 and $34,473, respectively.
71. In May 1963, Zaremba resigned from KEB and the corporation redeemed his shares of stock. Thereafter, Simon owned 88.8 percent of KEB’s stock and Nakoif and Robertson each owned 5.6 percent thereof.
72. (a) KRS had receipts of $142,220 for the period March 1,1958-May 31,1958 (Finding 6). As shown in Finding 47, it had receipts of $847,386.66, $1,350,657.03, and $784,586.50 for the full year periods ending May 31, 1959, 1960, and 1961, respectively. It had receipts of $11,125 for the period June 1961-August 14, 1961.
(b) The following table shows the receipts (in round figures) KEB had during the periods indicated:

Period Receipts

July 21,1960-October 31,1960_$475, 874
November 1,1960-October 31,1961_ 471, 927
November 1,1961-October 31,1962_ 422,492
November 1,1962-October 31,1963_ 428, 689
*389 (c) Plaintiff argues that the above admitted facts and figures prove its contention to the effect that by reason of the fact that the volume of business done by KEB after the liquidation of KES was approximately one-third that done by KES prior to KEB’s organization, it follows that “to the extent, if any, that the business conducted by [KES] prior to its liquidation is attributed to and regarded as one conducted with or by KEB” such business was “involuntarily and substantially contracted.” It should be pointed out that plaintiff arrives at its “approximately one-third” percentage figure by comparing KEB’s receipts of $422,492 for the period November 1, 1961-October 31, 1962, with KKS’s receipts of $1,350,657 for the period June 1, 1959-May 31, 1960. While said percentage figure is substantially correct (it is actually 31.3 percent), the above-mentioned comparison is invalid and plaintiff’s aforestated contention is rejected as being argumentative, misleading, and unsupported by the record.
The invalidity of plaintiff’s contention is apparent when it is kept in mind that Simon started doing business with Alvin in about 1955 'and that this was the primary account of both the proprietorship and KES; that during the year ending May 31, 1960, 85.4 percent of KES’s receipts ($1,171,318.34) was from Alvin, 7.1 percent ($96,745) from Peter Ezepka, 3.6 percent ($49,910) from Groynom, and 3.9 percent ($53,091.52) from 11 other builders or companies (including a receipt of $1,177 from Coury); that, therefore, 96.1 percent of KES’s receipts were from Alvin, Ezepka and Groynom, or calculated in another way, that only 14.6 percent of KES’s receipts were from sources other than Alvin (see Finding 16(a));[35] that in 1960, Simon organized KEB for the purpose of doing new Alvin business exclusively and *390 therefore there was a vobmtary “contraction” of KBS’s business in that year by reason of the fact that it stopped bidding, in favor of KEB, on Alvin work which had produced 85 percent of KBS’s receipts the previous year; that KEB had no business to start with and had to bid on the new Alvin woi'k; that when KEB ceased doing business with Alvin, the only sound business reason for having it remain in existence and seek work that constituted KBS’s principal business and produced substantially all of its receipts was that Simon probably would have lost the services of Zaremba and Nakofi, if KEB had been liquidated, and Simon did not want this to happen because he considered them to be highly competent, reliable, and deserving of an interest in a business of their own; that during the first six months of KEB’s operations, the total receipts of KEB and KBS were running at a rate in excess of KBS’s receipts for the previous year; that the combined receipts of these two corporations started decreasing only after KEB lost the Alvin account in December 1960, and KBS, which theretofore had operated a successful and highly reputable carpentry subcontracting business for many years under the direction of Simon, decided not to compete with KEB for this kind of work and commenced concentrated efforts to obtain contracts for large public construction projects as a general contractor in j oint ventures with another contractor, which involved business activities substantially different from those KBS had previously experienced; that Simon actively sought new carpentry subcontracting work for KEB and permitted KBS’s principal business to dwindle away to the point that the corporation stopped doing this kind of work altogether in March or April of 1961; that KEB had receipts of $395,581.73 during the first year after KES’s liquidation — $422,492 for the period November 1, 1961, through October 31, 1962, used by plaintiff — as compared with receipts of $199,746.52 KBS had during the year ending May 31,1960, exclusive of receipts it had from Alvin business which KBS voluntarily gave up in favor of KEB; *391 and therefore KEB bad $195,835.21 more receipts during the first year after KES was liquidated — $222,745.48 more for the period November 1,1961, through October 31,1962 — than the latter corporation had for the year ending May 31,1960, when the Alvin business given up by KES was excluded from the computations.
The foregoing facts and the record show that both before and after KES was liquidated, KEB carried on a carpentry subcontracting business which was substantially the same as the one operated by KES before it stopped doing this kind of work, and that KEB actually performed a larger volume of business than KES received from builders other than Alvin before the account was voluntarily given up by KES; and that KEB’s continuance of such business after the liquidation of KES resulted in an increase in business over that done by KES after it voluntarily gave up the Alvin account.
73. Plaintiff requested a two-part finding (No. 55 B) consisting of (1) a table purporting to be a comparison of (I) the “tax liabilities which would have been payable if the Simon Co.’s [KES’s] business had been conducted in unincorporated form (or if it had elected under Subchapter S to be taxed as a small business corporation) [the figures under heading I — “Doing Business Unincorporated” are explained in paragraphs one through seven of a note to the commissioner] with (II) the actual tax liabilities reported and paid by the Simon Co., Mr. and Mrs. Simon, the Plaintiff and the other two trusts during the period of the Simon Co.’s existence,” i.e., 1958-1961 (the figures under heading II are explained in an unnumbered paragraph in the same note to the commissioner); and (2) an assertion to the effect that in addition to the tax liabilities shown under II to have been actually paid, the Internal Eevenue Service is asserting additional deficiencies against KES. On the basis of the afore-stated proposed finding, plaintiff also requested another finding (No. 55 C) stating “Doing business through the Simon Co. [KES] was more costly to the Simon family than if the *392 same business bad been done in unincorporated form (or under a Subchapter S election.” [36] (Emphasis supplied.)
Plaintiff’s aforestated requested findings are rejected as being speculative, argumentative, immaterial and irrelevant. Plaintiff’s comparison is distorted, inaccurate and meaningless without the income generated by KEB during 1960 and 1961 being included therein, and constitutes unacceptable proof of the fact which the findings in question were admittedly intended to establish. Aside from the above-stated reasons for rejecting these proposed findings, it is obvious that any such comparison as made by plaintiff necessarily requires computations based upon a business experience involving many imponderable factors and resulting tax consequences which could not possibly have been accurately foretold at the time the decisions were made to incorporate Mr. *393 Simon’s proprietorship and to organize KEB. In view of the foregoing, it is difficult to see how a comparison of this kind, involving an after-the-fact analysis of end results, could show that the decisions and actions determinative of the form in which the business was conducted were not motivated, at least in part, by a desire to avoid taxes.
74. The parties stipulated, with the concurrence of the commissioner, that the initial trial of this action would be limited to the issues of law and fact raised in the pleadings relating to the right of plaintiff to recover, the determination of the amount of recovery, if any, being reserved for further proceedings.
Conclusion of Law
Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is therefore entered to that effect. The amount of recovery is reserved for further proceedings under Buie 47 (c).

 Revenue Act of 1924, ch. 234, § 201, 43 Stat. 253.

 S. Rep. No. 398, 68th Cong., 1st Sess. 11-12 (1924).

 See H.R. Rep. No. 1337, 83d Cong., 2d Sess. 40 (1954).

 H.R. Conf. Rep. No. 2543, 83d Cong., 2d Sess. 41 (1954).

 In recognizing the congressional directive, the Internal Revenue Service has promulgated the following regulation: “A liquidation which is followed by a transfer to another corporation of all or part of the assets of the liquidating corporation or which is preceded by such a transfer may, however, have the effect of the distribution of a dividend * * Treas. Reg. § 1.331-1 (c) (1955).

 See text at note 2 supra; Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 338-39, 349-50 (23 ed. 1966).

 See Bittker & Eustice, supra note 6, at 340-41.

 Commissioner v. Berghash, 361 F. 2d 257 (2d Cir. 1966) ; Joseph C. Gallagher, 39 T.C. 144 (1962).

 Davant v. Commissioner, 366 F. 2d 874 (5th Cir. 1966), cert. denied, 386 U.S. 1022 (1967) ; Pridemark, Inc. v. Commissioner, 345 F. 2d 35 (4th Cir 1965).

 Cf. Pridemark, Inc. v. Commissioner, 345 F. 2d 35 (4th Cir. 1965).

 See Bittker & Eustice, supra note 6, at 275-77.

 The record discloses that sometime in 1956 the proprietorship built a home for a party named “Nasser” as a general contractor.

 Although plaintiff’s contention that KRS also engaged In carpentry subcontracting in the commercial field Is technically correct, the record discloses that KRS actually performed work on only one commercial project, a shopping center called Brookgate, which job was done in 1959.

 Sometime in 1959, KRS built a house as a general contractor for a party named ‘'Sheldon.” Details concerning other general contracting projects undertaken by KRS and business activities involving work in this field are set forth in Findings 41 (and footnote 9 thereto), 46 and 50(a).

 The exhibits from which the receipts of both KR.S and KBB were obtained omitted certain minor items and therefore the totals in this and other findings, infra, involving such receipts, are approximations.
The receipts from “Groynom” were from the Homestead Corporation (as mentioned in Finding 15) in which Messrs. Groynom and Simon each owned a 50 percent interest.

 There is no evidence in the record as to the actual worth of any of these shareholders, nor whether or not any one of them could have raised more cash if he had desired to do so. Zaremba testified that $2,000 was the amount he could afford to invest, and Simon corroborated this testimony. Both Simon and Zaremba presented testimony, uncorroborated by other evidence, to the effect that the cash contributed by the shareholders represented the amounts they could afford to invest. While it is possible that Zaremba, Nakoff and Robertson could have obtained funds with which to make a larger investment if they had been willing to do this, it may be reasonably inferred and concluded that all of the shareholders, except Simon, invested the amount of money they could “afford.”

 See Finding 42 and footnote 12 covering a contract obtained from “Pate and Biscund.”

 It will be apparent from the fact and Finding 37(a) that KEB had total receipts of $628,676.54 from Alvin Builders during the period August 5, 1960-July 31, 1961.

 Although the time periods in this finding, i.e., 40 (a), (b), (c), and (d), are not comparable to those specified in Finding 37 (a), (b), (c), and (d), the facts in these two sets of findings clearly disclose, among other things, that the volume of KEB’s business substantially decreased after it lost the Alvin account in December 1960; that the volume of KRS’s carpentry subcontracting business decreased substantially both after KEB started doing new Alvin business in July 1960, and after KRS completed work on existing Alvin projects in December 1960; and that, although the volume of carpentry subcontracting business of both KEB and KRS declined after they stopped doing Alvin work in December 1960, subsequent thereto KEB developed a substantially larger volume of carpentry subcontracting business than KRS whose business continued to decline to the point it did no more work of this kind after sometime in March or April 1961.

 This amount is not supported by the record. In its reply to defendant’s objections to plaintiff’s requested finding 23, plaintiff contends that KRS had (in addition to receipts representing new carpentry subcontracting business obtained after the formation of KEB) receipts “from sale of the property at 7405 Marlborough Road of $26,770.00 and from Concrete Wall of $4,127.00,” totaling $30,897. Plaintiff’s Exhibit 1 shows that KRS received from unidentified sources, a “Down payment” of $8,990 and an item identified as “7405 Escrow” in the amount of $17,779.98, totaling $26,769.98. It may be reasonably assumed that these payments were made by the purchaser of the above-mentioned property, since KRS’s federal income tax return for the period beginning June 1, 1961, and ending August 14, 1961, shows that the same property was sold for $27,000. This house was one of two double houses which KES built on its own land on Marlborough Road in joint ventures with Concrete Wall. The other one of these two houses remained unsold and it was transferred to Mr. Simon as a part of his proportionate share of KRS’s assets which were distributed to the stockholders of KRS in connection with its liquidation. KBS received payments from Concrete Wall on March 17 and August 4, 1961, in the amounts of $1,956.37 and $2,170.70, respectively, totaling $4,127.07. While the testimony is unclear, as best it can be determined from the record, these receipts represented payments made by Concrete Wall to reimburse KRS for materials it purchased which were used in constructing one of the two houses built by KRS and Concrete Wall as joint ventures, and/or for men KRS loaned to Concrete Wall when it was building a house for the personal use of one of the Coury brothers (see Finding 67). In any event, it is clear that KRS’s receipts from the sale of this house on Marlborough Road amounted to approximately $27,000, rather than $30,879.05 (as contended by defendant and undisputed by plaintiff). Mr. Simon testified to the effect that this house was sold at a pro-fit of approximately $3,000 which was equally divided between KRS and Concrete Wall; however, KRS reported on its above-identified federal income tax return that its gain from the sale amounted to $2,749.80.

 KEB’s records (plaintiff’s Exhibit 1) show that KEB had receipts during 1960 and 1961 from “Sherwood,” “W. B. Pate,” and “Forest Ridge,” which sources are collectively sometimes thereafter referred to as the “Pate and Biscund” account, contract, work or business; that it first received payments from the Pate and Biscund account on December 22, 1960, which totaled .$3,400, there being no other receipts from said source in that year (see Finding 37(a)) ; that during the period January 1, 1961, through July 31, 1961, it had total receipts from this account of $105,703.78; and that on September 22, 1961, it received $2,324.75 from the same account. Thus, it is apparent that the Pate and Biscund account produced receipts for KEB totaling $111,428.53 during the years 1960 and 1961.

 Plaintiff argues that it does not follow from the facts in the instant finding, coupled with testimony presented by Zaremba to the effect that he was “a carpenter by trade” (cited by defendant in support of its position that Simon, rather than Zaremba or Nakoff, was in the position to- obtain contracts for either KEB or KES), that Zaremba (who admittedly also gave his occupation as “construction superintendent”) was not in large part responsible for the success of KEB. One of the difficulties with plaintiff’s argument is that while KEB was successful in obtaining some new business, it is not clear whether plaintiff is simply contending that Zaremba, particularly, was “responsible” for the success of KEB, or contending both that he was responsible for its success and that it was, in fact, successful. Considering the record as a whole, particularly, for example, among other things, that Simon made the decisions that resulted In KEB’s being formed and obtaining the Alvin work; that he assisted KEB to obtain other contracts; that much of KEB’s business came from builders for whom Simon and KRS had done work; that KEB lost money during the first two full years of its operation, starting November 1, 1960, despite the joint efforts of Nakoff, Zaremba, and Simon (who devoted full time to KEB’s affairs after KRS was liquidated in August 1961) ; and that Zaremba left KEB in May 1963 — tit cannot be found that Zaremba was “largely responsible” for the success of KEB or that said corporation met with "success” while he was with the corporation.

 Defendant requested a finding to the effect that the facts surrounding the Pate and Biscund contract demonstrate that Simon was the only person in the position to obtain contracts for either corporation. While in a literal sense the foregoing is true, the commissioner rejected defendant’s requested finding because of the inference which might be drawn therefrom that Nakoff and Zaremba were not in a position to obtain some work for KEB. Such a finding also would be objectionable because of the implication that Simon could have obtained the Pate and Biscund contract for KRS. This is not to say that Simon was not in the position, technically, to obtain this contract for KRS, but Nakoff and Zaremba certainly would not have willingly permitted this to have been done after they had participated in getting the account.

 Plaintiff’s Exhibit 22.

 See Finding 41 and footnote 9. Plaintiff does not consider these receipts as reflecting carpentry subcontracting business.

 Both plaintiff and defendant refer to the receipts from these two companies as representing Fred Rzepka business and list such receipts separately from those received from companies owned by his brother, Peter Rzepka, mentioned hereinbefore. As best it can be determined from conflicting and unclear testimony presented by Peter Rzepka, he owned at least 17 building companies, including Investa (Investía) Homes and R & R Homes, both of which, and possibly others, he operated in association with Fred Rzepka. The testimony shows that the latter ran the two above-named companies and made the decisions as to the carpentry subcontractors and other contractors who would work on projects undertaken by these two companies; but there is no evidence with respect to the ownership interest, if any, Fred Rzepka had in said companies.

 Since the receipts from Investa Homes, R & R Homes and Kubinski obviously represent comparatively small jobs, there seems to be an inconsistency in plaintiff’s position that KRS bid on only those jobs which were too large for KEB to handle and a question arises as to how it came about that KRS rather than KEB sought and obtained these particular contracts.

 It appears that except for one Instance, ICRS’s joint venturer was Concrete Wall Company or Amend Masonry Inc., which were companies owned and operated by John Coury and several brothers, Including one by the name of Tom.

 In considering these findings relating to the cash and net worth of KES needed to obtain bid and performance bonds, see, e.g., Oman Construction Co., Inc. v. Commissioner, 24 TCM 1799. While there the taxpayer operated a construction business different from the one carried on by KRS, certain statements contained in the findings of fact and opinion rendered by the Tax Court in Oman are considered helpful as indicative of surety company requirements in general.

 Tlie record does not disclose whether the salary of this employee was paid entirely by KRS or by the joint venturers, but it may reasonably be assumed that KRS was reimbursed or credited for at least part of such expense in some manner.

 The total price of the bid was $393,761 and it was submitted under date of April 5, 1961, to an architect representing Sobel Corrugated Containers, Inc. As best it can be determined from confused, conflicting and unclear testimony presented by Simon, it appears that Tom Coury gave Simon an unsigned copy of this bid after it was sent in; that when he protested the fact that the proposal did not indicate KRS was a joint bidder, Coury told him that it did not matter as both KRS and Concrete Wall were on the bid bond together; that this did not satisfy Simon; that thereafter KRS’s firm name was typed on its copy of the bid; and that KRS’s name was supposed to be added to the signed original, but it was not available for introduction in evidence and the evidence will not support a finding that this was ever done.

 KRS had only two payrolls In July 1961, one on July 5 In the amount of $913.48 and one (Its last payroll) on July 12, 1961, of $1,081.88.

 See Finding 61 (a) for a comparison of KRS’s assets, including cash in other property, which were distributed to the stockholders of KRS on August 14 and November 14, 1961, in exchange for their stock upon the dissolution of the corporation.

 These detailed findings covering KRS’s property as of July 31, 1961, are considered necessary because of plaintiff’s apparent attempt to equate the question of the assets KRS “required” and “used” with the question of KRS’s “need” for the “earnings” it accumulated during its existence. While these questions are somewhat interrelated, they involve different considerations, legal issues, and provisions of the Internal Revenue Code of 1954. See Finding 55.

 It appears that shortly before the trial of this ease in August 1965, a list of the tools was prepared and a valuation of approximately $8,000 placed thereon by a tool salesman who did not actually examine the tools then on hand, but simply testified to the effect that tools of the type listed had been sold to KRS by his company, that KRS sent its tools to the company for reconditioning regularly, and that in 1961 such tools were worth the amount stated.

 Defendant objects to plaintiff’s said contention on the ground that it states a legal conclusion which is not before the court. Since plaintiff is substantially correct in stating (in response to defendant’s objection) that said objection ignores the charge directly and/or indirectly made by defendant that KRS accumulated earnings which it was attempting to remove from the business at capital gain rates, the commissioner feels that the facts found in the instant finding may be helpful to the court in resolving the legal issues involved in this action.

 Plaintiff contends at several points that builders usually invited more than one carpentry subcontractor to make bids on a contract and that the work was generally awarded on a competitive basis to the lowest bidder. While this may have been the general practice, the evidence indicates that it was not always true; that in some instances a low bidder sometimes lost out to a higher bidder who subsequently lowered his bid; and that on occasion agreement on a contract price was reached after negotiations with a particular subcontractor which resulted in the bid being “shaved.” Considering the large volume of work both KBS and KEB did for certain builders over an extended period of time, it is suspected that both of these corporations received many contracts not because their original bids were the lowest submitted but rather due to the fact that after the bids were in, they lowered the prices.

 Mr. Simon also received certain electric power tools which were not included in the reported distribution by KES to its stockholders. While a comparison of the assets reported as distributed to KRS’s shareholders with those listed in Finding 54(a), which KRS “had on hand” as of July 31, 1961, and all of which plaintiff contends KRS “used” in its business during the year ended May 31, 1961, discloses that these assets are substantially the same, the book value of some of these assets as of July 31, 1961, is different from the value thereof shown at the time they were distributed to KRS’s shareholders.
The parties are in sharp disagreement as to whether certain of KBS’s assets distributed to its shareholders (as well as KRS’s assets which were sold and/or rented to KEB during the time both corporations were carrying on business operations) should be classified and described as “fixed,” “depreciable,” “operating,” or in some other manner. While plaintiff does not directly specify the items of property which it considers and included in the term “fixed assets” are those included in the term “operating assets,” plaintiff uses these terms interchangeably, and indirectly suggests that most, if not all, of the assets and properties distributed were “fixed operating assets” or at least “operating assets.” In view of the foregoing, the list of assets includes a heading which shows the classification found to be proper as to each asset listed. These classifications have been made in conformity with accepted accounting principles and terminology considered applicable to the assets in question in light of the use made thereof by KRS in its particular business operations.

 Plaintiff contends that a small amount of “equipment,” not constituting a substantial part of KRS’s “operating” properties, was rented by Mr. Simon personally to KEB. It is clear from the record that the “equipment” referred to by plaintiff consists of the property included under the three aforestated categories of assets distributed to Mr. Simon by KRS; that plaintiff considers that most, if not all, of the assets reported by Mr. Simon and the other shareholders as distributed to them were “operating” assets; and that plaintiff’s contention that the property Mr. Simon rented to KEB was not a substantial part of KRS’s operating assets is based solely on a comparison of the value of the rented items with the value of the other assets distributed by KRS to its shareholders.

 While these facts are literally supported by the record, it should be noted that defendant objects thereto on the grounds that they state a legal argument. The issue of law raised is discussed in the opinion, supra.

 See, e.g., Findings 15, 16, 37(b), 43(a), 45(a), and 58(c) as to Peter Rzepka; Finding 45(a), and footnote 15 as to Fred Rzepka; Findings 15, 16, 37(b), and 45(a) as to George Groynom; and Findings 41, 43 (b) and (f), 45(a), 50 (a) and (b), and footnotes 9, 17 and 20 as to John Conry and his brothers.

 See Findings 37(a), 40(b), and footnote 7.

 The facts concerning tlie contract obtained by KEB from Peter Rzepka after it was decided to liquidate KRS are set forth in Finding 58(c) and will not be repeated here. It is sufficient to note that those facts and the ones contained in the instant finding clearly show the specious logic underlying plaintiff’s aforestated contentions with respect to the Rzepka and other jobs KEB obtained from builders who had previously done business with KRS.

 In support of this contention plaintiff cites page 2|96 of the transcript which discloses that William Robertson (accountant for KEB and KRS) presented uncorroborated and speculative testimony, without reference to books or records, to the effect that he thought KEB had a cash balance of “around” $140,000 as of November I960, which was down to $40,000 by July 1961. Such testimony clearly does not constitute proof of the facts requested by plaintiff, and they are not supported by any other citations in the record, as required by Rule 57 (e) (1).

 This table and the one set forth in paragraph (b), infra, of the instant finding are based upon KEB’s corporate income tax returns for the years listed which were the only returns introduced in evidence.

 KRS’s cash receipts during its fiscal year ended May 31, 1960, totaled $1,371,004.86. However, its income tax return for the same period shows gross receipts of $1,350,657. While the record does not disclose the reason for the difference between these two income figures, it is probably due to the fact that KRS maintained its records on an accrual basis, whereas plaintiff’s Exhibit 1 lists total cash receipts.

 Defendant first objects to plaintiff’s said requested findings 55 B and 55 C on tbe general grounds that they are “wholly irrelevant and immaterial,” in response to which plaintiff states that said objections “overlook certain critical language in the Congressional Committee Report [H. Conf. Rept. No. 2543, to accompany H.R. 8300, (Pub. L. 591), 83d Cong., 2nd Sess., p. 41 (1954) ] ; that the “conferees there noted, in situations where it is ‘attempted to withdraw corporate earnings at capital gain rates’ by liquidating a corporation and ‘promptly reincorporating the business assets,’ that ‘tax avoidance * * * can appropriately be disposed of by federal decision or by regulation’ within the framework of the Internal Revenue Code.” Plaintiff then goes on to argue that the material in the above identified requested finding “is not only relevant and material, it goes to the very heart of the case”; and that if (as plaintiff contends it has shown), “there was no purpose either to withdraw earnings at capital gain rates or to avoid taxes, then the specific requirements of the reorganization provisions of the Internal Revenue Code are not to be dispensed with (as the defendant would have the court do) in order to deter tax avoidance.” (Emphasis supplied.)
Defendant specifically objects to plaintiff’s requested finding 55 C on the ground that the facts therein are “meaningless” because (1) Mr. Simon was on a calendar tax year and KR!S was on a fiscal tax year ending May 31 and (2) the income generated by KEB in 1960 and 1961 is not in the comparison.
As to point (1) above, plaintiff responds by stating in effect that the fact KRS used a fiscal year is fully and correctly accounted for in the figures set forth in plaintiff’s requested finding 55 B because KRS’s entire income for each fiscal year is taxed to shareholders each year as if KRS were a Subehapter S corporation or a partnership (i.e., as if it had not been incorporated).
As to point (2) above, plaintiff argues that comparing the tax cost of doing KRS’s business in unincorporated form with the cost of doing KRS’s business through KRS “hardly requires including KEB’s income in the computations” because “this would have been directly contrary to the very purpose for which Requested Eindings 55 B and 55 C are submitted — to show that there could have been no tax avoidance since the tax cost of doing its business would have been less if it had never existed and the income of the ‘Simon Co. had been taxed directly to its shareholders.”